# In The Matter Of:

*Johnathan Yasevich, et al. v.*
*The Heritage Company, Inc. and Sandra Franecke*

---

*Johnathan Yasevich*
*May 10, 2023*

---

*Grigsby Reporting Services*
*135 Oneida Way*
*Maumelle, AR  72113*
*(501) 580-5117*
*faithccr686@gmail.com*

Original File 05-10 Johnathan Yasevich.prn
**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION


JOHNATHAN YASEVICH, et al., Each
Individually and on Behalf of all
Others Similarly Situated                    PLAINTIFFS


VS.                          NO. 3:20-19-KGB


THE HERITAGE COMPANY, INC., and
SANDRA FRANECKE                              DEFENDANTS



ORAL DEPOSITION OF

JOHNATHAN YASEVICH

MAY 10, 2023



APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
     MR. DANIEL FORD
     SANFORD LAW FIRM
     650 SOUTH SHACKLEFORD, SUITE 411
     LITTLE ROCK, ARKANSAS  72211
     daniel@sanfordlawfirm.com

ON BEHALF OF THE DEFENDANTS:
     MR. NICKOLAS W. DUNN
     DAVIDSON LAW FIRM
     724 GARLAND STREET
     LITTLE ROCK, ARKANSAS  72201
     Nickd@dlf-ar.com



GRIGSBY REPORTING SERVICES
135 ONEIDA WAY
MAUMELLE, ARKANSAS 72113
(501) 580-5117
faithccr686@gma3699il.com

2

INDEX

STYLE AND NUMBER. . . . . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . . . . . . . . 1

CAPTION. . . . . . . . . . . . . . . . . . . . 3

WITNESS:  JOHNATHAN YAWVICH

     Examination by Mr. Dunn . . . . . . . . . . . 4

     Examination by Mr. Ford . . . . . . . . . . . 85

DEPOSITION CONCLUDED . . . . . . . . . . . . . . 90

COURT REPORTER'S CERTIFICATE. . . . . . . . . . . . 91

EXHIBITS

DEFENDANTS'                                         MARKED

Exhibit 1     Handbook (79 Pages) . . . . . . . . . . 45

Exhibit 2     Receipts (2 Pages) . . . . . . . . . . 45

Exhibit 3     Workbook (19 Pages) . . . . . . . . . 47

Exhibit 4     Letter (2 Pages) . . . . . . . . . . . 58

Exhibit 5     Complaint (27 Pages). . . . . . . . . . 61

Exhibit 6     Time Log (5 Pages) . . . . . . . . . . 63

Exhibit 7     Pay Rate (3 Pages) . . . . . . . . . . 71

Exhibit 8     FMLA Log (7 Pages) . . . . . . . . . . 72

Exhibit 9     Supplemental Answers (13 Pages). . . . . 82

3

1                           CAPTION

2          ANSWERS AND ORAL DEPOSITION OF JOHNATHAN YASEVICH,

3    a witness produced at the request of the Defendants

4    taken in the above-styled and numbered cause on the 10th

5    day of May, 2023, before Faith Grigsby, Arkansas Supreme

6    Court Certified Court Reporter #686, at 9:55 a.m., at

7    the Davidson Law Firm, 724 Garland Street, Little Rock,

8    Arkansas, pursuant to the agreement hereinafter set

9    forth.

10

11                    * * * * * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                         PROCEEDINGS
 2         THEREUPON,
 3                         JOHNATHAN YASEVICH,
 4                   THE WITNESS HEREINBEFORE NAMED,
 5               having been first duly cautioned and
 6               sworn by me to testify to the truth,
 7               the whole truth, and nothing but the
 8               truth, testified on his oath as
 9               follows, to-wit:
10                         EXAMINATION
11   BY MR. DUNN:
12   Q    Good morning.
13   A    Good morning.
14   Q    I know we introduced ourselves earlier.  Of course,
15   my name is Nick Dunn and I represent the defendants in
16   this case, Heritage and Ms. Franecke.  Would you state
17   your name for the record, please, sir.
18   A    Yes.  Johnathan Yasevich.
19   Q    And how old are you, Mr. Yasevich?
20   A    Thirty-three.
21   Q    Is it Yasevich?
22   A    Yasevich.  Yes.  It's Yasevich.  Like I said, the
23   "A" and the "E" pronunciation is kind of switched, so --
24   Q    I want to make sure I try and keep up with that.  I
25   don't want to call you by the wrong name.
```

5

1      Mr. Yasevich, where do you live, sir?

2   A    I live in Jonesboro.

3   Q    And what is your address?

4   A    2103 Hampton Drive, Jonesboro, Arkansas, 72401.

5   Q    And how long have you lived in Jonesboro?

6   A    I've lived in Jonesboro -- oh, gosh.  Let me think

7   about this.  So, my daughter's eight.  So, altogether,

8   probably about nine years, including my college years,

9   so --

10  Q    Have you ever given a deposition before?

11  A    No.

12  Q    So there's some ground rules, and I think the court

13  reporter has tried to kind of give you some of that

14  already.  Just so you know, obviously, we are making a

15  record, so it's important that we verbalize our

16  responses.  And it's also important that we use yes and

17  no and not --

18  A    Understood.

19  Q    -- uh-huh and huh-uh --

20  A    Okay.

21  Q    -- because those are sometimes hard to distinguish

22  when you're reading a transcript.

23  A    Understood.

24  Q    Gotcha.  Obviously, the format is sort of a

25  question and answer.  You understand?

6

1   A    Yes.

2   Q    And if you don't understand a question, let me know

3   and I will try to either restate it or rephrase it,

4   however we need to do that.

5   A    Understood.

6   Q    If you need to take a break, you can let us know.

7   We can do that.  I typically try to take a break every

8   hour or so that we go.

9   A    Okay.

10  Q    But if you need to take a break otherwise, just let

11  me know.  I'd only ask that we wait until the end of,

12  sort of, a question-and-answer sequence before we do

13  that, all right?  That way there's nothing hanging out

14  there.

15  A    Understood.

16  Q    Are you under the influence of any drugs or

17  medications today that may impair your ability to

18  testify truthfully or fully?

19  A    No.

20  Q    And do you suffer from any impairment that would

21  impact your ability to do that?

22  A    No.

23  Q    I think I know the answer to this, but are you

24  married?

25  A    Yes.

7

1   Q   And how long have you been married?

2   A   I've been married, it will be nine years this June.

3   Q   And what is her name?

4   A   Angelieque.

5   Q   Yasevich?

6   A   Yes.

7   Q   And you have a daughter.

8   A   Yes, and a son.

9   Q   And a son.

10   A   Uh-huh.

11   Q   And the daughter is the oldest?

12   A   No, she is the youngest.  She's eight.

13   Q   And how old is your son?

14   A   Fourteen.

15   Q   Do they go to school there in Jonesboro?

16   A   Yes.

17   Q   I think you mentioned some college.  Where did you

18 go to high school?

19   A   Cabot.

20   Q   Cabot.

21   A   Uh-huh.

22   Q   Did you grow up in Cabot?

23   A   For my high school years.  I moved there when I was

24 in ninth grade.  I started ninth grade there.  Finished

25 high school.  Kind of moved around most of my life.

8

1    Q    Have you always lived in Arkansas?

2    A    I would say, for the majority of my life I have.

3    I've lived in Oklahoma, Kansas, Missouri, and I was --

4    of course, I was born in California, so --

5    Q    And your adult life, has it been all in Arkansas?

6    A    All Arkansas, yes.

7    Q    And you went to college.  Did you go to college in

8    Jonesboro?

9    A    Yes.

10   Q    Arkansas State?

11   A    Uh-huh.

12   Q    And did you obtain a degree?

13   A    No, I did not.

14   Q    How many years in college did you do?

15   A    I had about two years there.

16   Q    And what were you studying?

17   A    Broadcast Journalism.

18   Q    After Arkansas State, did you -- I guess, what age

19   were you?  Is that straight out of high school?

20   A    Yes, it was straight out of high school.  So, I

21   stopped college -- I'm trying to check my dates.  2008.

22   I was about 21 when I stopped.

23   Q    Did you attend any other college after that?

24   A    No.

25   Q    What about any other higher education/training?

9

1    Anything like that?

2    A    No.

3    Q    No certifications that you are aware of after that?

4    A    No, no certifications.

5    Q    I want to talk about kind of your job history.

6    A    Okay.

7    Q    Did you start working when you were 16?

8    A    I started working when I was 15.  My stepdad at

9    that time worked at a mechanic shop, so I got hired to

10   sweep the floors for them.

11   Q    Was that in Cabot?

12   A    That was actually in Sherwood.  That's where the

13   shop was, but we did live in Cabot.

14   Q    Gotcha.  And how long did you work there?

15   A    Oh, it was, like, a few months at that time.

16   Q    Gotcha.  What was your next job?

17   A    My next job -- my actual one that I applied for and

18   got hired was McDonald's, and that was for about three

19   months.

20   Q    Were you a cook?

21   A    Kind of everything.

22   Q    Gotcha.  What about after that?

23   A    After that, I started an extensive career within

24   Pizza Hut off-and-on up until I was about 22, I believe,

25   because that's when I got my first DJing job.  So,

1   between the age of 17 -- 16/17 until about 21, I

2   believe, is when I stopped Pizza Hut.

3   Q    What positions did you hold while you worked there?

4   A    I've done everything from cook, delivery driver,

5   and shift leader, as well.

6   Q    Was that in Jonesboro?

7   A    That was in Cabot, Maumelle, and Jonesboro.

8   Q    Gotcha.  What about after Pizza Hut?

9   A    After Pizza Hut -- I quit Pizza Hut as soon as I

10  got hired at the -- at that time, the Electric Cowboy in

11  Jonesboro, which was a nightclub.

12  Q    What did you do there?

13  A    I was a DJ.

14  Q    Was that a full-time position?

15  A    At that time, yes, it was.

16  Q    What -- is that -- I assume the hours were at

17  night.

18  A    Yes.  The hours would be -- I think when I started

19  there I would go in about 8:00We wouldn't -- we wouldn't

20  open doors until about 10:00 because, typically, clubs

21  up there go from 10:00 to 2:00.  I'm sorry.  It opened

22  at 9:00, but nothing got started until about 10:00.  I

23  would work there from -- Thursdays through Sundays,

24  because that's when -- the nights they would be open.

25  Q    And how long did you work at the Electric Cowboy?

11

1    A    I worked there until 2014, which is the year me and
2    my wife got married.  Then from there, I wasn't working
3    at that time.  My wife was.  And then that following --
4    that following -- a few months after I quit -- or got
5    fired from the Cowboy because they were looking for
6    another DJ, I started work at Heritage, which would have
7    been October of 2014.
8    Q    Why were they looking for another DJ?
9    A    Well, for the club, the demographic was changing.
10   The Electric Cowboy was a franchise, so there's multiple
11   clubs within the south that had a format of
12   country/pop/hip hop; predominantly country.  So,
13   typically in a night I had a five-song country set.
14   Then I would mix that in with about four different songs
15   between hip hop/EDM/things like that.  What tended to
16   happen is, our younger crowd got bigger.  Your older
17   country crowd, which was supposed to be the core of that
18   club, started to diminish.  The format changed.  They
19   started to lose money.  And after I was let go and they
20   had a replacement DJ, two months later it was shut down.
21   So, I think they were just trying to scramble on their
22   last legs and figure out what they needed to do.
23   Q    And then 2014 is when that happened, right?
24   A    Uh-huh.
25   Q    And then you started with Heritage?

12

1    A    Yes, that following October.

2    Q    And then you worked with Heritage, of course, until

3    December of 2019?

4    A    Yes.

5    Q    And were you working for anyone else during that

6    five year or so period?

7    A    Not for anybody else.  I had started a personal DJ

8    business and, so, I would do occasional gigs.  Not a

9    lot.  Didn't produce a lot of money within that year.

10   It was just here and there, so

11   weddings/quinceañeras/birthday parties.  Things like

12   that.  And then occasionally I would get -- you know,

13   maybe every other weekend I would be working at what was

14   the Electric Cowboy.  The manager bought the place and

15   reopened it into a new nightclub, so I would have those

16   nights on the weekends.

17   Q    And are you still doing that?

18   A    Yes.

19   Q    And, I guess, in December of 2019, after Heritage

20   shut down, what did you start doing after that?

21   A    So, the company that I currently, work with, CRF,

22   which is out of Indiana, is just like Heritage.  We call

23   for nonprofit -- not for profit charities.  I think it

24   was that following February, pandemic just hit, I

25   started working for them, so I was out of a job maybe

13

1    about a month-and-a-half.

2    Q    And is that something you can do from home?  Or how

3    is that --

4    A    Yes.  This one is from home.  We've got employees:

5    some in Indiana, South Carolina, Arkansas, and I think

6    we got one in Florida.  There's probably a total of 12

7    of us that work at this company.

8    Q    Twelve --

9    A    Twelve employees.

10   Q    -- sales employees?

11   A    Yes.

12   Q    A similar position of TSR?

13   A    Uh-huh.

14   Q    Do they call it a TSR?

15   A    Actually, I don't know if that term is used with

16   them.  That's what I got from Heritage --

17   Q    Right.

18   A    -- and that's what I use, so --

19   Q    So that was sort of a smooth transition for you,

20   would you say, from Heritage to --

21   A    Yeah.  I got on the ball.  None of us could have

22   saw the pandemic but, I mean, I guess I made the smart

23   decision to find something quickly and, you know, by the

24   grace of God, I did.

25   Q    Good.  Are you still doing that job?

14

1    A    Yes.  I had parted ways with them for about a

2    year-and-a-half after that, and then I just recently

3    came back.  When did I start back?  I think it was

4    February, again, of this year.

5    Q    So, how long was the break in between?

6    A    The break in between -- let's see.  I want to say

7    it was about two years.  I worked for another call

8    center in Jonesboro for about a year.  And then this

9    last year, starting in March, I was doing factory work

10   up until October.  I quit my job at Anchor.  I then got

11   some sit-down time.  Needed it, too, so -- and then I

12   started back up, like I said, this February.

13   Q    So, you say some sit-down time.  We're talking from

14   October to February --

15   A    Uh-huh.

16   Q    -- of this year?  So, about a four-month period

17   where you weren't working other than --

18   A    Yes.

19   Q    Were you still doing the DJing?

20   A    Yeah, I was still doing it.  I don't know how often

21   but, yeah, here and there I was getting some nights.

22   Q    Gotcha.  Have you done any other work that you can

23   think of?  Any other employment other than what we've

24   talked about?

25   A    No, that's -- did I do any -- no, it's just been

15

1    factory and call centers, pretty much, so --

2    Q    What does your wife do?

3    A    My wife owns a vending machine business.  We

4    actually -- she's got an eyelash vending machine at

5    McCain Mall.  She's working on another one right now.

6    And she also works at Amazon in Memphis.

7    Q    Does she drive into Memphis from --

8    A    Yes.

9    Q    -- Jonesboro?

10   A    Yeah.

11   Q    Have you spoken to anyone in preparation for this

12   deposition today?

13   A    My lawyer.

14   Q    Anyone else?

15   A    No.

16   Q    What else have you done to prepare for this

17   deposition?

18   A    Everything that I've done is just try to gather

19   what social media I have because, as far as

20   documentation, it's been quite a few years and I didn't

21   -- I tried to look for a paystub but couldn't find any,

22   so all I could get was some Facebook post, which is

23   probably the closest thing that I could have.

24   Q    What was the Facebook post?

25   A    The Facebook post were -- had to do with what I

1  originally filed for, the WARN Act, but that was about

2  it.  That's really all that I have.

3  Q    What was the content?  Who posted the post, I

4  guess?

5  A    Sandra.

6  Q    And this is -- what was the contents of the post?

7  A    The contents of the post had to do with her

8  response after the company shut down.

9  Q    Response to what employees were saying?  Or what do

10  you mean by "response"?

11  A    To why we shut down and the -- what had happened,

12  which some of us kind of knew prior, but not in full

13  extent.

14  Q    Regarding the filing of this lawsuit, was there a

15  conversation with other employees about getting it

16  started?

17  A    There was a conversation basically, you know, after

18  it -- after we had got let go.  It was just kind of

19  ranting, you know.  People were upset.  Everybody was

20  like, "We should sue," you know.  "You should do this,"

21  but nobody did anything.  That's why I stepped up and

22  filed the lawsuit.

23  Q    What medium were these conversations occurring?

24  Was this --

25  A    Basically, just post comment.  Somebody would be

1   upset about losing their job, or somebody's, you know,

2   just speculating on what happened or -- there were some

3   posts about, are we going back?  Are we not?  Basically,

4   people just -- just expressing how they felt.

5   Q    This was all via Facebook?

6   A    Uh-huh.

7   Q    Were there any group text messages or e-mails or

8   anything like that?

9   A    No.  The only message I got that is -- that has to

10  pertain to any of that was one of my coworkers, which is

11  how we found out -- or how I found out that it was

12  closing.  She messaged me.

13  Q    Who was that?

14  A    Her name is Katie Hensley.  She was the night

15  shift.  I was day shift, so as day shift left, it was --

16  it was different employees from night shift that was

17  telling other people that we closed down.  Nothing from

18  managers or higher -- or anybody else that was higher

19  up.

20  Q    What did Katie tell you?

21  A    She said, if I can quote almost, it's, "Dude,

22  Heritage shut down."  I said, "What?"  And --

23  Q    How long before -- well, how long between the time

24  you heard that did you hear -- I guess, see this

25  Facebook post from Sandra?

18

1   A     I'm going to say it was after -- after Christmas,

2   because we got -- we got let go.  It was a Friday.  It

3   was my last shift for that week and Christmas was -- I

4   don't know if it was the following Monday or Tuesday.

5   It wasn't until after the Christmas break, so maybe that

6   following week -- end of that following week that she

7   had made a post.  I don't remember the exact date,

8   but --

9   Q     What is Heritage?  What does it do?

10  A     Heritage was a company that was there to raise

11  money for not-for-profit charities.  So, some of those

12  would be Children's Wish, Special Olympics.  It wasn't

13  until the last few years of my employment there that we

14  started reaching into political parties, which would

15  have been the Republican National Committee that we

16  called for.

17  Q     And does it have multiple locations?

18  A     Now, there is multiple Heritage locations.  I

19  believe at that time when I left there was Jonesboro;

20  one in Little Rock.  I know there was a Conway facility,

21  but it got shut down.  And there was another one, but I

22  can't remember the other location of it.

23  Q     And you worked for the one in Jonesboro>

24  A     Yes.

25  Q     And you say you started in 2014?

19

1    A    Uh-huh.

2    Q    And did you work for any other location other than

3    the Jonesboro --

4    A    No.

5    Q    -- location?  No?

6    A    No.

7    Q    And what positions did you have while you worked

8    there?

9    A    Okay.  I had TSR, so just regular phone-caller.

10   And then for -- there for a time I was coaching, which

11   was kind of a manager position, but you can debate that.

12   But --

13   Q    And then, did you go back to being a salesperson?

14   A    Yes.

15   Q    So, Salesperson, Sales Coach/Manager, --

16   A    Uh-huh.

17   Q    -- and then back to a salesperson.

18   A    Uh-huh.

19   Q    And what were the time frames for those?  Do you

20   recall?

21   A    I got into coaching -- let's see.  I started in

22   2014.  I believe I got my coaching position that April

23   of 2015.

24   Q    So, you had been there --

25   A    Not even a year.

1  Q    -- less than a year?

2  A    Uh-huh.

3  Q    How did you apply for the job?

4  A    My wife had told me about it.  You know, after the

5  -- after I got let go from the Electric Cowboy, we had

6  spent some time -- or she was working, and then that

7  October she was like -- you know, I was deciding, I need

8  to get a job.  She goes, "Well, if you need to get

9  something quick, go to Heritage."  I -- she had went

10  there prior, worked there for, like, a week.  So, I

11  said, okay.  Then I went up there, applied, and got the

12  job instantly.

13  Q    So, you applied in-person.

14  A    Yes, I sure did.

15  Q    And who did you talk to when you did that?

16  A    I can't remember her last name, but her name is

17  Muna.  She was the -- she was head of HR in our

18  facility.

19  Q    And did you take -- have an interview?

20  A    Yes.  The process is, you go up there.  You, of

21  course, fill out an application on the computer back

22  there.  Once that was put in, they pull you back -- Muna

23  would pull me back into the HR office, do some interview

24  questions, and say, "Here's your start date."  It was a

25  pretty simple process.

21

1    Q    So, you applied and interviewed and received the

2    job all in the same day?

3    A    Yes.

4    Q    And who is the -- Muna, is that the one --

5    A    Yes, her name is -- her first name was Muna.  I

6    don't remember her last name.

7    Q    Was she --

8    A    Oh, no.  Yes, Muna, I think it was Maggit.  I think

9    the last name was, if I'm not mistaken.  I might be

10    wrong on that, but I believe it was -- her last name is

11    Maggit.

12    Q    Was she the one that offered you the job?

13    A    Yes.

14    Q    And then she told you your schedule was going to be

15    this?

16    A    Uh-huh.

17    Q    How are you paid -- how were you paid during the

18    course of your employment?

19    A    So, when I -- the times that I worked there when I

20    was just a regular TSR, we got paid weekly.  When I was

21    a coach, we got paid biweekly.

22    Q    Were those both hourly --

23    A    Yes.

24    Q    -- positions?

25    A    They're both hourly positions.

22

1  Q    And what did you -- did they -- did Heritage

2  provide you with some type of notice of how you would

3  get paid -- or, excuse me, how much you would get paid

4  when you started?

5  A    Yeah.  So, actually, when I went and I applied --

6  I'm trying to think of what minimum wage was.  I think

7  they were doing, like, $8.50, but I asked for nine and I

8  got it when I got hired, so that's what I started out

9  at.

10 Q    And was that in any writing or was that just, kind

11 of, a verbal --

12 A    I would imagine it's in writing.  I don't have any

13 documentation, but I believe that it was in writing.

14 Q    Other than your hourly wage, what benefits did you

15 receive from Heritage?

16 A    They offered benefits, but I didn't receive any.

17 Q    Did you receive any meals or food from the company?

18 A    The only time we had meals or food is if we had

19 some specific celebration and, as far as I know, the

20 company -- each facility, I believe, would get money

21 sometimes to do stuff/to give out.  It didn't happen

22 very often but, you know, the times that we did have

23 food, it was just for a celebration.

24 Q    Did you get bonuses for certain performances or --

25 A    There was no bonuses.  What they did do is

1    evaluations.  I think it was, maybe, every three or four

2    months.  And they would do an evaluation and, from

3    there, they would decide if they want to give you a

4    raise.  Usually it was, like, a quarter, I think.

5    Q    Did you ever receive, like, a free trip or some

6    kind of incentive like that for meeting certain goals?

7    A    No.

8    Q    The company did provide health insurance.  You just

9    didn't partake in it?

10   A    Yes, they provided health and dental and, I

11   believe, 401(k), but I didn't opt into any of them.

12   Q    And what about paid days off:  vacation/sick days?

13   A    There -- there was no vacation or -- paid.  Now,

14   with my medical condition I have, I had FMLA, but that

15   was -- that was it.  You know, if you had something

16   medical, that's all you could really do, so --

17   Q    Was your position full time?

18   A    Yes.

19   Q    What was full time?

20   A    Forty hours a week.

21   Q    Was there a minimum?

22   A    I think -- well, they had -- we have part time

23   there, and I think part time was 20 or 25 hours.  I

24   can't remember exactly.  I never worked it.  But I know

25   that full time was between 35 and 40, but I always

24

1   worked 40.

2   Q    I think we talked about this, but I want to be

3   sure.  Were you working for anyone else while you worked

4   for Heritage?

5   A    No, other than my occasional DJ gigs.

6   Q    Was that an issue for Heritage at all?

7   A    No.

8   Q    What hours did you typically work when you worked

9   for Heritage?

10  A    Starting out I was night shift, so night shift, I

11  believe, was -- I believe it was from 4:00 to 9:00.  I

12  believe that's what I worked.  I'm trying to remember.

13  Yeah, 4:00 to 9:00.  I think there at the beginning when

14  I was doing night shift we had some 10:00 -- that, like,

15  run until 10:00, but they did away with that because the

16  clients that we called from 9:00 to 10:00,  we had

17  maybe, like, four people calling, and we were calling

18  Hawaii and Alaska, which, they didn't produce any

19  profit, so --

20  Q    Did you always work the 4:00 to 9:00 shift?

21  A    Not all the time.  It wasn't until, I want to say,

22  2017, I believe, I went back on the phones and I decided

23  to do daytime.

24  Q    What was the daytime shift?

25  A    Daytime was from -- it was 7:00 to 5:00 or 8:00 to

1    5:00.  I don't remember exactly.  One of those.

2    Q    The night shift, 4:00 to 9:00 is five hours?

3    A    Okay.  My bad.  Let me retract that.  That was --

4    that was for -- typical for somebody.  No, I actually

5    would go in there at -- oh, God.  What time did I go in?

6    So, I did work eight hours.  I'm just trying to think.

7    So, maybe 3:00.

8    Q    Well, that'd be six hours.

9    A    Six?  Let's see.  It was a while back.  I know when

10   I started -- when I started coaching, I was there at

11   noon every day.  I didn't work on nighttime as a TSR for

12   very long, so that's why it's kind of hard to remember.

13   Q    So, in the five years or so that you worked there,

14   what shift did you primarily work?

15   A    I would say, for the most part it was night shift,

16   because I didn't start -- like I said, I didn't start

17   day shift until, like, 2017, and that was whenever I got

18   off of coaching -- or I didn't start day shift until

19   2017, because I got off of coaching.  So, from the time

20   I started until then, it was night shift.

21   Q    And you think -- you said when you started coaching

22   you came in at noon.

23   A    Yes.

24   Q    And then you would have worked eight hours?

25   A    Uh-huh.

1   Q   And was there a lunch built into that or no?

2   A   Yes.  We always had a 30-minute lunch.  For day

3   shift I believe it was between 11:00 and 12:00.  I don't

4   -- again, I don't remember exactly.  Or it may have been

5   11:30.  Between 11:00 and 12:00.  Night shift it was, I

6   think, around 6:00, maybe.

7   Q   And you got, what, a ten-minute break every hour?

8   A   Every two hours, I believe.  It wasn't every hour.

9   It was about every two hours.

10   Q   Did you keep a log of any of the hours you worked

11   while you worked for Heritage?

12   A   No, I did not.

13   Q   Who would have kept up with your hours?

14   A   Probably the directors.  Maybe the HR.  To be

15   honest, I don't -- I don't really know who was

16   specifically over that.

17   Q   Gotcha.  What days did you work, typically?  Did

18   that change or was there a set --

19   A   So, night shift was -- let's see.  Day shift was

20   Monday through Friday.  Night shift, I believe, was

21   Tuesday through Sunday -- or -- no.  I'm sorry.

22   Wednesday through Sunday.  Yeah, because Sunday shift

23   was night shift.

24   Q   And, so, you would have been on one or the other.

25   A   Yes.

27

1   Q    And how many days a week would you have worked?

2   Just five days?

3   A    Five days a week, yes.

4   Q    Was there ever a week you worked more than five

5   days?

6   A    Yeah, there were some weeks that I did.  Yes.

7   Q    And why would -- would that have been a shorter

8   shift -- a couple of shorter shifts to --

9   A    It would have been a shorter shift, because most of

10  the time when they -- when they did overtime, it was

11  only an extra four hours unless -- there were some times

12  that the directors would allow 50 hours, but that wasn't

13  typical all the time.

14  Q    When you say, "the directors," who are you

15  referring to?

16  A    I'm referring to the -- I would say, the managers

17  of the building.  The leaders of our building, so, you

18  know, that would have been Derrick Followell and Derek

19  Tutolo.  And, basically, the buck stopped with them in

20  that building.

21  Q    The two Derek's.

22  A    Uh-huh.

23  Q    Did you ever take a day off or fail to show up for

24  work for any reason?

25  A    I've taken days off, but that was through FMLA.  I

28

1   had -- I've battled a liver disease from 18 until 31,

2   which, when I turned 31 I got my liver transplant.  So,

3   through that process at Heritage, I did get sicker as I

4   went along, so my days off would increase, but that was

5   all through FMLA.

6   Q    Got it.  We talked about the breaks.  You got a

7   30-minute lunch break --

8   A    Uh-huh.

9   Q    -- every day and then you say a ten-minute break.

10   Was it 10-minute/15-minute breaks?

11   A    Strictly ten minutes.

12   Q    Ten-minute break.  And what were you permitted to

13   do?  How did that work?

14   A    Really, just ten minutes off the phone.  So, some

15   people sat inside.  Some people went out back to smoke

16   cigarettes.  Some people sat in the breakroom.

17   Q    So, one ten-minute break every two hours.  So, an

18   eight-hour shift, you're talking four ten-minute breaks,

19   roughly.

20   A    Uh-huh.

21   Q    Did you ever make any personal phone calls while

22   you were at work?

23   A    Yeah, I'm sure I have.  I think everybody did

24   outside when they're on break, if they needed to call.

25   Q    What about while not on break?

29

1    A    No.  You weren't allowed to use your phone on the

2    floor.

3    Q    And how would Heritage have governed that -- or

4    prevented somebody from doing that?  Was there a

5    supervisor walking the floor or --

6    A    So, each -- when you're in there, everything was

7    sectioned off.  You would have 12 seats within each

8    section, and at each section there, was a coach.  So,

9    the coach's responsibility was to make sure people

10   weren't playing on their phones while they're on the

11   phone and things like that.  If it was an emergency and

12   you had to, you would go up to your coach and then the

13   coach would release you to go do it.

14   Q    And this is a position you held for a while.

15   A    Uh-huh.

16   Q    We're going to get there.  We're there now.

17        Tell me about the duties for a TSR or a

18   salesperson.

19   A    Okay.  For a salesperson, basically, all you would

20   do, you would clock into whatever program that was.  So,

21   each program had a login.  Once you logged in, you would

22   hit enter.  You'd start and, basically, the system is on

23   an automatic dialer, so everything is -- you have

24   multiple numbers that are dialed at once.  Whatever

25   first picks up, it hits that line.  So, you would just

1   be sitting there constantly calling.  After one call was

2   done, whether you made a sale or not, boom, another 30

3   seconds you have another call on your line.  And your

4   basic job was, on the phone, pitch the pitch that was

5   given to you.  You had to take three nos, so we had two

6   rebuttals and, also, state disclosures that you had to

7   say within the pitch.  Those were required, too.  And

8   that was basically it.

9   Q    How many phone calls -- was there a quota, or is

10  there a certain number of phone calls a day that a TSR

11  was supposed to reach?

12  A    No, nothing was based on certain number of calls.

13  So, basically, what they looked for was dollars per

14  hour.  How much were you putting up between each hour.

15  So, for there, if you were -- after you had been through

16  the training process and made it to the floor, been

17  there for, maybe, a month or two, your requirement, at

18  least, was $40 an hour.  If you were, after a certain

19  period of time -- once evaluation came, if you weren't

20  producing 40 hours, you were out the door.

21  Q    And you said that the way that the floor was set

22  up, there would be sections.

23  A    Uh-huh.

24  Q    And there were how many TSRs in a section?

25  A    There was -- it was always set up for 12.  No coach

1    would have more than 12 people in its section.

2    Q    And there would be a computer in front of each

3    person --

4    A    Uh-huh.

5    Q    -- and a telephone.

6    A    Uh-huh.

7    Q    And the TSR would log into the computer, and each

8    had their own unique login, I suppose, or --

9    A    Yes, each person had the unique login, but you had

10   multiple logins because each program required you to log

11   in.

12   Q    Did each computer have all the programs?

13   A    Yes.  Now, the way that's set up is, the lead

14   specialist would distribute what program was calling for

15   whatever section.  So, they would -- so, if we were

16   calling, like, maybe, four different programs within the

17   building, those leads would all be loaded up and,

18   depending on what section you are or what you were

19   calling that day, your login -- you'd log into that

20   program.

21   Q    Would you -- so, you would -- so, you didn't know

22   what program you were getting that day, but you would

23   get one assigned to you before the day started.  Then

24   that's where you -- and you stayed there all day or --

25   A    No, it wasn't just a specific program you stayed

32

1    there all day.  They would switch the programs up all

2    day.  I know when I started out, from the time I would,

3    you know, start to finish for that day, I probably

4    called, like, four or five different programs.  They may

5    run one for an hour because, you know -- say, for

6    example, Special Olympics, we're calling past buyers,

7    people that have already given.  Well, they're only

8    distributing so many leads for that one, and then they

9    may switch up the program.  You may go Special Olympics

10   dip taps, you know.  Just whatever they had to --

11   leading the team that day.

12        So -- and then, on top of that, if you weren't

13   performing -- so, let's say you're running a program

14   that's a past buyer.  It's a certain hourly requirement.

15   If you were not meeting that hourly requirement, you

16   would get switched into another program.  So, there was

17   constant in-and-out of programs all the time which

18   required you to log out and log back in.  And some were

19   in different locations, too, which required you to move.

20   Q    And you said that would occur probably four or five

21   times a day?

22   A    Oh yeah.  It was a -- it was a daily thing.

23   Q    And how long -- I mean, say you're at the same

24   computer and you're going to log out of one program and

25   log back into another program, how long did that take?

33

1    A    If you're sitting there at your chair, it shouldn't
2    take you more than 10 to 15 seconds, but if you're
3    moving to another part --
4    Q    Sixty seconds?
5    A    Maybe 60 seconds.  A minute or two.  It just
6    depends on what part of the building you were going to.
7    So, it was always inconsistent.  But I would say from
8    that about -- if you're moving the building, probably a
9    minute or two.
10   Q    How big is the building, roughly?  I mean, any idea
11   how to measure that?
12   A    Oh God.
13   Q    I mean, can we see --
14   A    I honestly -- I'm looking here.  Probably as big as
15   this building here total of that side over there, too.
16   Q    So, I mean, you're saying, maybe, a couple hundred
17   feet --
18   A    Yeah.
19   Q    -- in either direction.
20   A    Yeah.  There was enough where -- let's see.  So,
21   the front part of the building there was four sections,
22   so that's four times twelve.  Then in the back sections
23   you actually have more, so there may have been six
24   sections that seated twelve.
25   Q    And how many -- I want to make sure I understand.

34

1    When you say, "Programs," we're talking about actual
2    software that the computers would run and you have to
3    log out of one and log into a different one?
4    A    I -- yes.  I would believe that's how it is.  Let's
5    see.  Now, there was -- about three years after that --
6    four years after that there was two different systems,
7    so we had our old one that was on old IBM computers, and
8    that's where majority of our programs were, whatever
9    they loaded into the system for that day.  But we had
10   introduced a new system, or they were trying to, called
11   UniFi; newer computers, started getting political
12   programs, things like that.  That right there created a
13   big issue.
14   Q    Why is that?
15   A    Because it was never fully functioning right.  We
16   would go over there when, say -- because -- especially
17   bigger performers called the bigger programs which,
18   typically, were over on that side.  You would go over
19   there and sometimes they would have -- they would have
20   you log out of your computers in the old section and
21   come over there to log in, but then you'd run into a
22   problem where you couldn't log in.  So, they're sitting
23   there.  "Hey, we have to wait 10/15 minutes to get this
24   program loading.  Something's not doing right with the
25   login."  Or we would start calling and the scripts were

35

1    just not right, so that we'd have to log back out for

2    that and wait until -- it was -- it was a very janky

3    system and it was -- constantly needed work on and never

4    functioned properly.

5    Q    And when did that -- when did the UniFi system come

6    about?

7    A    Well, see, they started the UniFi system about

8    three years after I worked there.  They ran that for

9    about a year and then they stopped it, and then that

10   year-and-a-half before the company shut down they

11   started introducing it again.

12   Q    What was the name of the other programs?

13   A    For the UniFi system we started calling St. Labre

14   Indian School, Ashland, Montana.  It was for a Christian

15   Native American school.  We did the Republican National

16   Committee, which was one of our bigger programs.  And

17   then we had some -- we had some calls that were just

18   thank you calls.  So, we called, like, local charities

19   for, like, firefighters or police departments and we

20   were just making a thank you call.  We weren't trying to

21   actually get money out of those.

22   Q    And, so, I guess what I'm hearing is, you're saying

23   you have -- UniFi is what you would call the system, and

24   within UniFi there are programs specific to certain

25   charities.

36

1    A     Yes.   The UniFi system had specific ones whereas

2    our normal system had all of our -- our core, what we

3    called.  I mean, like I said, that was the older

4    computer systems.

5    Q     What was that system called?  Do you recall?

6    A     I don't even know if they had a name for it, to be

7    honest with you.

8    Q     And you talked about the TSR duties.  What were the

9    duties of the leads?

10   A     The lead specialist?

11   Q     Or the coaches.  I'm sorry.

12   A     The coaching?  Okay.  So, there was a lot.  With

13   coaching, you had -- okay.  So, you were in charge of

14   keeping up everybody's stats; so, you know, how many

15   contacts they were making.  You had to, of course, make

16   contacts, you know.  If you had somebody that, you know,

17   typically you're running 15 contacts an hour for this

18   and you've got somebody that's running four, your job is

19   -- you're basically playing detective, see what's going

20   on, and then you have to correct that situation with

21   that particular person, you know.

22         So, I had to stay on the phone.  Basically, we had

23   -- we had, you know, a section of 12, so 12 different

24   phones and my line, I would be able to connect to each

25   phone so I could listen to their pitch.  If somebody's

1    not doing good this hour, my job was to get on the

2    phone, listen, and coach them out loud through that

3    process so they can make a sale and bump our stats up.

4         That, in a nutshell, are the core of what I had to

5    do was basically just coaching people on the phone.

6    There was other little things, you know, as far as

7    setting goals for each of my players, having a team

8    goal, building morale.  It's a very mental job, and it

9    was my job to keep everybody within what we needed to

10   do.

11   Q    Did you like being the coach?

12   A    I enjoyed it for a while.

13   Q    Why did you decide to go back to TSR?

14   A    Well -- so, there -- there was a very bad

15   management problem when it came to that.  Our directors

16   -- it was -- it was weird, because they would want you

17   to have authority.  And one of my things that they were

18   always on me is, "You need to have more authority within

19   your section," which is great and all, but when it came

20   to discipline when somebody was not doing their

21   procedures properly and they were just disobeying on

22   purpose, I had no power, because I would say one thing

23   and then our -- our manager for that night -- see, each

24   -- morning shift and night shift, they had assistant

25   managers that ran that shift under the directors, so if

38

1    I had a problem with a person there's nothing I could do

2    about it.  They would -- they would come to me and I

3    would get in trouble for not disciplining and this

4    particular problem in my office festering, but my

5    manager -- my upper managers would not back me up.

6    Q    Got it.

7    A    So, my people would go to them if they -- if I had

8    an issue with them and I was going to discipline them.

9    They would go behind my back and go to the upper

10   managers and then they would take control of it.  So,

11   they basically told me I had to have authority in what I

12   did, but took it away from me.

13   Q    Got it.

14   A    It was just an inconsistent model that was not

15   going to work.

16   Q    So, you decided you're better off being just TSR.

17   A    Yeah.  That's a combination of that and they took

18   me down from the position.  With coaches, coaches were

19   moved in-and-out all the time.  Like, there may have

20   been, like, two or three that had their positions stayed

21   and been there for a while, but everybody else was moved

22   in-and-out all the time.

23   Q    Between Coach and TSR?

24   A    Uh-huh.

25   Q    Gotcha.  Tell me the hierarchy within the building

39

1    -- or within Heritage.  It's got the TSRs, then the

2    coaches, and then assistant manager from there?

3    A    Yes.  You have TSRs.  You had your coaches.  Then

4    you had your shift managers which, basically, were kind

5    of assistants.  You had one for day and you had one for

6    night.

7    Q    Right.

8    A    They pretty much knew how everything was run in the

9    building.  They could run leads.  They could call.  They

10   could coach.  After them, it was the directors.

11   Q    That's the Dereks?

12   A    Yes, those are the Dereks.

13   Q    What about above them?

14   A    Above them, it probably would have been Sandra and

15   whoever else she had working within her group.

16   Q    Some executive group?

17   A    Yeah, but, like, I've seen them once, maybe.  I've

18   not talked to them, so --

19   Q    Who did you see once?

20   A    Now, I have seen Sandra in my career there probably

21   twice in our building.  The last time I saw her was, we

22   had a -- I don't know if it was around -- I want to say

23   September or October she had came up for some kind of

24   celebration that we were doing.  She was -- they were

25   giving out awards for performance and stuff like that

40

1    and she talked to us for a little bit in a little

2    meeting area and was talking about how great the company

3    was doing, how everything was good, and congratulating

4    on us, and talking about new clients that we were going

5    to have, as well.

6    Q    That was -- was there another time besides that?

7    A    I think we had, like, a 50-year anniversary

8    celebration that she showed up with other, I guess,

9    people that were in her area higher-up for the company.

10   I don't remember who those names were.  I didn't pay

11   attention at the time, so --

12   Q    Gotcha.  And, so, let's go back a little bit on the

13   -- we were talking about the shift managers and then the

14   directors.  Who set the schedules every week?

15   A    Schedules?  I am not sure.  I don't think it was

16   the Dereks.  They were busy doing other stuff.  It

17   probably was the assistants that ran the shifts.  That

18   -- I mean, that's who I think it was.  I honestly don't

19   know who actually made the schedule.  Everybody pretty

20   much knew when you got hired on what schedule you were

21   working, and that schedule really didn't ever change.

22   Q    Gotcha.  How many supervisors did you have during

23   the time that you worked for Heritage?

24   A    The directors we had, two, and they always stayed

25   as the Dereks.  Now, shift leaders changed.  I think we

1    -- like, as far as the night and day shift, I think that

2    changed maybe -- there was four different people that I

3    remember.

4    Q    Who were they?

5    A    Corey Throgmartin One's name was April.  I can't

6    remember.  April Clayton at that time.  And then there

7    was two other people, but they were at -- when I first

8    started there, so I really don't remember who they were.

9    Q    And how much interaction would you have with

10   supervisors on a daily basis?

11   A    Oh, all the time, especially when I was a coach.

12   We were in contact with -- the directors were -- were

13   very involved within the facility.  Like, sometimes, you

14   know, Derek Tutolo would come out and, you know, maybe

15   some of the coaches were on a break or, you know, in a

16   specific meeting for that day and he'd come sit out

17   there.  They would come out and talk to the group.  If

18   we were doing great that day and needed something, or

19   there was something very important needed to be

20   explained, they would come out there.  They were very

21   involved in the day-to-day processes, so --

22   Q    The Dereks?

23   A    Yes, they were.

24   Q    Gotcha.  Along with the shift lead -- the shift

25   manager.

42

1   A     Yes.

2   Q     And, so, did you get your marching orders, so to

3   speak, from either the Dereks or from the shift lead?

4   A     Uh-huh.

5   Q     So, would there have been anybody else that --

6   A     No.

7   Q     -- directed you?

8   A     Like -- no.  They already -- there was always

9   somebody there within that core group right there that

10  was there.  I don't think anybody else had authority.

11  They may have thought they had, but they didn't.

12  Q     That would be, like, maybe another coach?

13  A     Another coach.  Something like that.

14  Q     Have you ever had any formal disciplinary of any

15  kind?

16  A     As far as disciplinary, the only thing I can think

17  of was -- which they -- which fed into evaluations and

18  how they did things, how they docked your pay was,

19  maybe, a violation on the phone if you didn't say a

20  state disclosure, if you didn't do a rebuttal.  I think

21  the only ones I ever got was from a state disclosure not

22  being read.

23  Q     And what was the -- how was that treated?

24  A     You got a warning, and then if -- I think you got

25  about two warnings, and then if it happened again, you

1    got a dock of pay.

2    Q    Did you ever get your pay docked?

3    A    No.

4    Q    Did you ever make any complaints to management or

5    any other employee that supervised you?

6    A    Oh yes.  Plenty.

7    Q    What were they?

8    A    My complaints always went to either Corey

9    Throgmartin, which was the night shift assistant or it

10   was directly to the Dereks.  I would just go straight to

11   them.

12   Q    And what were the complaints, usually?

13   A    It was -- mainly it was just mismanagement.  The

14   only times I ever went to them with issues was

15   mismanagement on how things were operating, especially

16   within my office, and then there was a few times about

17   missing hours.  Not very many, but there was a few times

18   of missing hours.

19   Q    When you say that there were complaints of

20   mismanagement, what do you mean?

21   A    Just the way that we were -- like I explained

22   earlier, especially about disciplinary.  There were some

23   -- if there was somebody under the influence, we had a

24   whole process for that, too, for detection and how we

25   went about, you know, getting them in the office and

1    questioning and thing like -- things like that.

2    Q    And you said you had -- a couple times you had

3    complained about the hours.

4    A    Uh-huh.

5    Q    How was that situation handled?

6    A    I would go -- if I was missing hours -- and usually

7    it was due to logging in and logging out, and the UniFi

8    system issue, which was where a lot of time got missed.

9    So, I would go to them about this and then they would

10   try to go through the records and then correct it all.

11   Very few times I did that, my hours were taken care of

12   pretty -- pretty decent.  The issue with that is, this

13   was a whole building-wide thing.  So, say, if I missed a

14   day, had a doctor's appointment, they had a system

15   eventually -- because too many people were going up to

16   the office for missing time.  They tried to implement

17   this thing, you need to have your hour -- if you have

18   any missing time, you need to have it by the -- to the

19   front desk by this time this day, which I believe was,

20   like, a Friday.  Well, that put nighttime in jeopardy,

21   because if they didn't -- weren't there until after

22   5:00, day shift is gone.  And then if you miss a day and

23   it happened to be that Friday, your hours just weren't

24   accounted for.

25   Q    Let's go through some documents.

45

1   A    Okay.

2   Q    We'll start with this one.  So, we'll mark this one

3   as Exhibit Number 1.  I'll hand that to you.  Please

4   review that, if you don't mind.  Can you tell what that

5   is?

6                    (WHEREUPON, Exhibit Number 1 was marked for

7             identification and is attached hereto.)

8   A    It looks like the handbook if I'm --

9   Q    And if I represent to you that that is the Heritage

10  handbook, would that --

11  A    Yes, I remember seeing this.

12  Q    So you have seen it before.  Were you given a copy

13  of this when you started --

14  A    Yes.

15  Q    -- with Heritage?

16  A    Everybody did.

17  Q    I've got a couple more here.  This is going to be

18  -- and for identification purposes, Exhibit 1 would be

19  DLF-Heritage 00382 through 00461.

20      I've handed you Exhibit 2, which is DLF-Heritage

21  00341 and 00355.  Take a look at that.  Are these a copy

22  of your acknowledgment receipt of the handbook?

23                    (WHEREUPON, Exhibit Number 2 was marked for

24             identification and is attached hereto.)

25  A    Uh-huh.

46

1    Q    And you signed those?

2    A    Yep.

3    Q    And do you know why there's two different ones?

4    A    Honestly, I don't know.  They probably just handed

5    it within the hiring documents, so -- and just signed

6    both of them.  I really don't know why there's two.

7    Q    Well, do you -- if you'll -- do you note the dates

8    on those?

9    A    I don't know why they're -- I'm not sure why

10   they're at different times.  It may -- they may have

11   forgot to -- with this one being on 11/01/17 -- I don't

12   know why, unless they had -- unless they had a handbook

13   change.  That's the only thing I could think of why they

14   had me sign this at 2017, but I really don't know.

15   Q    Fair enough.  I just noticed -- I saw that and, so,

16   I thought --

17   A    Yeah.

18   Q    -- I'd ask you about it.

19   A    They might have had a handbook change or -- I know

20   sometimes with employees, some employees, after a while,

21   would have a missing document that they forgot to give

22   to them and they have them sign it.  That way it was

23   there for records.

24   Q    I'm going to do Exhibit 3 DLF-Heritage 00442

25   through 00461.  Take a look at that.  Do you recognize

47

1    that document?

2                      (WHEREUPON, Exhibit Number 3 was marked for

3              identification and is attached hereto.)

4    A    Yeah, it looks familiar.

5    Q    Would that be the orientation training handbook?

6    A    I believe so, but I'm going to be honest.  I don't

7    -- I don't really remember reading it.  Not saying that

8    I didn't get it.  As far as I remember with orientation,

9    we were in a training classroom.  The orientation lady

10   might have handed those out.  I don't really remember.

11   All I remember of that day is just getting on the

12   computers and going through procedures, so --

13   Q    I want to look at the handbook.

14   A    Okay.

15   Q    If you'll turn to -- if you'll look at the pages in

16   red at the bottom --

17   A    Uh-huh.

18   Q    -- there will be a Number 402.

19   A    Okay.

20   Q    And sort of just a little bit down the way on the

21   page, there's a title to this section here.  Can you

22   tell me what that is?

23   A    Which one?

24   Q    So, it'll be in the big, bold in the center.  We're

25   on Page 402.

48

1   A     The "Time and Pay" or are you looking for the

2   "Reporting Time --

3   Q     Yeah.

4   A     -- and Pay"?

5   Q     "Reporting Time and Pay", right.

6   A     Okay.

7   Q     And if you'll go to the next page, read the section

8   titled "Overtime Pay".  Do you see that?

9   A     Uh-huh.

10  Q     What does it say about the process for overtime?

11  A     "Overtime must be authorized by your manager.

12  Proper notification of the requirement to work overtime

13  will be given when possible.  Overtime work will be paid

14  according to the U.S. Department of Labor regulations."

15  Q     Thank you.  And then if you'll go to the other

16  document, the orientation workbook, Exhibit 3, we're

17  going to go to 444.  Do you see where the title of the

18  section is "Compensation and Evaluations"?

19  A     Uh-huh.

20  Q     And if you'll go to the next page, 445, it'll be

21  the second bullet paragraph.  Can you read that?

22  A     Yes.  "All overtime and make up time must be

23  approved by the Senior Manager/Director of Sales."

24  Q     Who would have been the -- who would that have

25  been?

49

1    A    Senior Manager/Director of Sales?  That would have

2    been the Dereks.  And like I said, they were -- the

3    overtime would be an announcement.  So, typically, it

4    would have been either them two coming out and

5    explaining that overtime was available or it would have

6    been somebody like Corey, who was the assistant, that

7    would have gave us that direction, depending on what

8    shift you worked what day manager was that, that would

9    give that to you.

10   Q    So, it's fair to say, then, that -- and, again,

11   overtime was directed or approved by the directors.

12   A    Uh-huh.

13   Q    And would you read that next paragraph there --

14   bulleted paragraph?

15   A    When you log in and begin your calling session for

16   the day, you will be clocked-in automatically.  When you

17   log out at the end of your calling session for the day,

18   you will be clocked-out.  All employees' time is stored

19   electronically.  Every Monday, payroll will update your

20   timesheets to be viewed on your computer.  It is the

21   responsible -- it is your responsibility to ensure that

22   the posted time is correct, and report any errors to

23   your manager before Tuesday evening.  If the errors

24   aren't reported in a timely manner, you will have to

25   wait until the following check to be compensated for

50

1   your missed time.

2   Q    Thank you.  Does that paragraph describe the

3   process employees used to dispute any issues they had

4   with their time calculations?

5   A    That's what was explained.  That's not what

6   happened all the time.

7   Q    What part of that was not followed when you say,

8   "Not all the time?"

9   A    It -- it came to be a problem because managers --

10  so, you would have -- like I said, your managers would

11  be up and down.  Sometimes your -- your managers would

12  be gone.  Sometimes you may be in a particular office

13  but, depending on a new program that we're calling, and

14  if your in -- fit in with that, you know, group that

15  called for that program, you would leave your manager

16  and may be down with them for the day.

17      It got -- the missing time got bad, like I said, to

18  where they put it so you had to go up to the person up

19  front to put your time -- missing time in.  It was no

20  longer that your particular shift leading -- or your

21  particular coach would do your time, because there are

22  many times that people would go to their -- their coach

23  and they would still have to go up front and get their

24  time corrected.

25      I know when I was a coach I didn't keep -- I would

51

1    see who got -- you know, for that day, who had came in

2    and let Corey know who came and who didn't, but I wasn't

3    required to keep up with their time, so I -- they never

4    came up to me for any time corrections.  They made that

5    a front office thing, whoever the secretary was at that

6    time.

7    Q    So, would you agree, then, that there was a method

8    here for employees to report any errors in their

9    calculations?

10   A    Yes, there was a method.

11   Q    And that while this in this document says, report

12   it to your manager, --

13   A    Uh-huh.

14   Q    -- it sounds like there were several manager

15   positions.

16   A    Yeah.

17   Q    So that word is a little bit ambiguous.

18   A    Uh-huh.

19   Q    But there was an individual that they --

20   A    Yes.

21   Q    -- could go to.

22              MR. DUNN:  It's been about an hour if y'all

23        want to take a break.

24              (WHEREUPON, after a break was taken, the

25        proceedings resumed as follows, to wit:)

52

1    Q    (By Mr. Dunn)  Before we went on break, we were

2    talking about this method used at Heritage for an

3    employee to raise an issue they had with their time

4    calculations.

5    A    Uh-huh.

6    Q    And you had -- correct me if I'm wrong, but it

7    seemed like you had discussed a few incidents where you

8    had to go and --

9    A    Yes.

10   Q    -- raise this issue, right?

11   A    Uh-huh.

12   Q    And did you -- just so I confirm, were those issues

13   addressed at that time?

14   A    Yes.

15   Q    Now, as far as other employees, would you have any

16   personal knowledge as to any times they went and did the

17   same thing?

18   A    Yes, there are some employees that I know of.  I

19   know for -- one of the people I closely worked with that

20   I told you who told me about the company shutting down,

21   Katie Hensley, she had issues with that, too.  I mean,

22   almost everybody I work with had time issues and had to

23   -- and, like I said, because of that, they had to switch

24   a system, which is not in the handbook of actually going

25   up to a secretary in the front to handle that.

53

1          But the problem was, it became too much of a

2     problem because of logging in and logging out of our

3     programs, and then when the UniFi system was introduced,

4     they would tell us that the times that -- if we had to

5     sit there for 15 minutes/20-minute increments, that the

6     time would be corrected.  There were still discrepancies

7     on those times, as well.

8     Q    So, when you say there were discrepancies on those

9     times --

10    A    Meaning that sometimes they didn't fill the time in

11    that was missing there.

12    Q    And would you go -- did you have --

13    A    It would be a whole -- oh, I'm sorry.

14              MR. FORD:  Make sure you let him finish.

15    A    I do apologize.

16    Q    (By Mr. Dunn)  That's all right.

17    A    I do apologize.

18    Q    Would you have, I mean, a specific occasion where

19    you had made a complaint to Heritage about this issue

20    and it was not corrected?

21    A    Yes.

22    Q    When was that?

23    A    I don't have a specific date, but the UniFi system

24    time, yes.  During those times I have had -- had those

25    issues where we'd go up to the front desk, like was

54

1    required, to have that time corrected and it would still

2    be short time.

3    Q    And then, did you -- and I guess you would find

4    that on your check.  When would you find that?

5    A    It would be on my check.  Yes.

6    Q    And did you go and then have them add time to your

7    next check or to cut you a new check?

8    A    I would have -- you would have to go to add time

9    for your next check that would come up.  It was a

10   constant catch-up game.

11   Q    And would that -- was there ever a time that the

12   time -- the unpaid time that you're claiming was not

13   paid to you on a subsequent check?

14   A    Yes.  So, those times -- you know, it would just

15   get to a point where you would be, like, tired of -- it

16   may be an hour or something like that and you would just

17   kind of go on with it.  And it got to the point where

18   there were some people that'd just go up to correct

19   their time, but there was always missing time and you

20   just kind of dealt with it.

21   Q    How many occasions did that occur to you?

22   A    From ones that I can recount, probably more than

23   four or five times.

24   Q    Over a span of?

25   A    Well, when I'm talking about the UniFi system,

55

1    about three years.

2    Q    Four or five times you were not paid overtime -- or

3    you were unpaid time.

4    A    Yes.

5    Q    And since 2019 -- well, when did the UniFi -- 2017?

6    A    2017 it went full blast.  They -- like I said, they

7    tried it about a year-and-a-half prior.  It wasn't up,

8    maybe, three months -- or -- and we stopped using it

9    because it was such an issue.  It just wasn't working

10   properly.

11   Q    So, four or five times in how -- I mean, how many

12   hours are we talking each time?

13   A    On average, between two and three hours on a check.

14   Q    So, four or five times since you worked at --

15   A    That I can recall.

16   Q    -- Heritage that you can recall, that you

17   complained about time not being on your timesheet and it

18   was not corrected.

19   A    Yes.

20   Q    At two or three hours a week for each time?

21   A    Uh-huh.

22   Q    But you don't know the dates, the weeks, the

23   months, or the years.

24   A    No.  I didn't keep any record and I'm not for sure

25   who did keep record.  Like I said, it -- it became a big

56

1    problem where all you just heard was people, you know,

2    complain about it multiple times, so --

3    Q    And who would have been the secretary or front desk

4    person that you would have made this complaint to?

5    A    So, those secretaries changed a lot.  The only

6    secretaries I can remember -- one of them has passed

7    away.  I think there was a girl named Danielle.  She was

8    -- she was younger.  She was probably, like, in her

9    early 20s.  She did night shift, and I know there was a

10   big issue with the times there.  Day shift, I'm trying

11   to think.  Jackie.  Her name was Jackie.  The last one I

12   remember.  There was multiple people who did front,

13   because that position changed out frequently.  It was a

14   lower-paid position than everybody else, so it wasn't --

15   there wasn't a lot of -- I would say -- yeah, her name

16   was Jackie, but I can't remember her last name.

17   Q    But regardless of who it was, there were four or

18   five times where you had expressed to this individual

19   time that was not credited, and it was not paid either

20   on that paycheck or the next.

21   A    Uh-huh.

22   Q    And, again, you don't know what days that occurred.

23   A    No, I do not have those dates.

24   Q    What about what year?

25   A    2017, 2018, and, I believe, 2019, too.  Like I

1    said, I don't have the specific dates, but within that

2    three-year span before the company closing there was

3    issues, because that's when that system changed over of

4    who we put our time in to.

5    Q    In 2017?

6    A    Uh-huh.

7    Q    Do you remember what month?

8    A    I believe it was the summer months that it got

9    addressed.

10   Q    How many -- but all of those issues would have

11   occurred post this new program system?

12   A    Yes.  For the majority of them, yeah.  That --

13   before it didn't seem like a big deal.  Like I said, it

14   wasn't until that UniFi system was introduced and we

15   started going full force with it that the times -- like,

16   the missing time really expanded.  Before, it may have

17   been, you know, an hour, maybe, something like that, but

18   this new system it -- you know, it just was -- it was a

19   mess.

20   Q    When you came in on Monday, would have HR posted

21   your time on your computer?

22   A    I believe so.  I believe there was a way to check

23   time but, then again, those weren't always accurate, as

24   well.  We didn't very much rely on that.  I know there

25   was times that I had to go directly to Muna, or maybe

58

1    one of the Dereks could pull it up on their computer.

2    Which, if it was a time adjustment that was really that

3    bad, I would try to go to the Dereks to get that

4    situated.  So, like I said, they did have a system to

5    display it.  Then again, sometimes that wasn't even

6    accurate.

7    Q    And how many times would it be modified before

8    payroll went out?

9    A    Honestly, I don't -- I don't know how many times it

10   would be modified.

11   Q    Would you see several versions of your timesheet in

12   a week?

13   A    Yeah, a week.  On the weeks that it would -- that

14   that would happen it would be a little off.  There were

15   some times it would be off and I would check and my

16   hours were actually there.  It was just the system, but

17   -- and then sometimes the hours weren't there when I did

18   check.  So, like I said, the thing about Heritage and

19   why -- and another reason that was such an issue is

20   because everything was inconsistent and was not managed

21   properly.

22   Q    I got another one.  Exhibit 4, DLF-Heritage 00440

23   through 441.  Mr. Yasevich, I want you to take a look at

24   that and let me know if you've ever seen that before.

25                  (WHEREUPON, Exhibit Number 4 was marked for

59

```
 1              identification and is attached hereto.)
 2   A     This written out, no.  I have -- I have never read
 3   this.  Now, the system automatically logging you out,
 4   that -- that says 21 minutes, but I would like to refute
 5   that.  I would say, maybe, after 15 minutes, because
 6   when we take our ten-minute breaks it would still --
 7   when you'd break out, it would still be there, but it
 8   wasn't much longer after ten minutes.  That's why we had
 9   to be back from break on-time, because if you weren't --
10   I would say about 15 minutes it would log you out.
11   Q     What else about this --
12   A     The cutting a separate check for missing time, that
13   is -- there was never a -- now, I don't know if it's
14   worded different, but there was never a separate check
15   cut.  If time was added, it would get put onto the next
16   check, unless -- or they would readjust it before
17   payroll come out, if it was corrected.  Never was there
18   a separate check put out.
19   Q     What else in this do you disagree with?
20   A     Okay.  So, I know this from experience for FMLA.
21   So, you were -- I know it says they didn't drop -- drop
22   tiers of pay.  Because I know when you didn't work your
23   specific hours you were dropped tier of pay.  So, like,
24   when I was finishing off, I was making $16 an hour.  For
25   some reason I didn't work my hours that week 35-plus, it
```

60

1    would drop down to, maybe, $2 less/$3 less.  When that

2    happened with my FMLA time -- because I did miss some

3    time -- quite a bit of time for FMLA with my liver

4    disease I was dealing with -- it did drop tier in pay.

5         Now, I don't have any of my payroll records to back

6    that up, but that was never an issue to me.  I knew it

7    happened, but at that time I was focused on my health,

8    so, you know, the tier drop didn't bother me.  But I

9    know for a fact they did not give you credit five hours

10   so you wouldn't drop tier.  That never happened.  I

11   would get dropped tier.  That's why even on the days

12   that I would work -- or the weeks that I would miss some

13   time for doctor's pay, I would make sure to work extra

14   to try to cover that up.  So, I'm not so sure about

15   that.  And I did FMLA frequently.

16   Q    Right.  What else?

17   A    As far as that, those are the only one that really

18   would stick out that was different from what I remember.

19   Q    Gotcha.  So, looking back at Exhibit 3 on Page 445,

20   that first paragraph where it's talking about -- on

21   445 --

22   A    Uh-huh.

23   Q    -- that first bulleted paragraph where it's talking

24   about hourly rates and hourly guarantees, do you see

25   that?

61

1    A    Uh-huh.

2    Q    Will you read that and tell me if that sounds like

3    the procedure that was used?

4    A    That -- that seems -- yes.  Like I was saying,

5    working under 30 hours, you would just get guaranteed

6    pay.  I believe that was still the same for part time.

7    I didn't work part time, but I don't remember hearing

8    anything different from that.  So, yes, that is right.

9    Q    Thank you.  This one is going to be Exhibit 5.

10    I'll hand that to you.  You'll get a title of that right

11    there on the second page.  Does that look familiar to

12    you at all?

13                    (WHEREUPON, Exhibit Number 5 was marked for

14              identification and is attached hereto.)

15    A    Yes.  Now, the names are familiar because I know

16    this is everybody that was opted into the collective

17    action lawsuit.  So, yes, these names are familiar.

18    Q    And that document, which has a title on the second

19    page First Amended Substituted Complaint Class and

20    Collective Action, does it look like the complaint,

21    basically, that the plaintiffs, including yourself,

22    filed in this case?

23    A    Yes.

24    Q    Go to Page 3, Paragraph 1 and just read that one

25    out-loud for me, if you don't mind.

62

1    A     Paragraph 1?

2    Q     Yeah.

3    A     Okay.  Plaintiffs bring this action under the Fair

4    Labor Standards Acts 29 U.S.C. 201 (FLSA), the Arkansas

5    Minimum Wage Act, Arkansas Code 11-4-201, and under the

6    Worker Adjustment and Retraining Notification Act for

7    declaratory judgment, monetary damages, liquidated

8    damages, prejudgment interest, costs at a reasonable

9    attorney's fee as a result of Defendants' failure to pay

10   Plaintiffs' overtime wages as required by FLSA and AMWA,

11   and as a result of Defendants' failure to provide

12   sufficient notice of mass layoffs or plant closure as

13   required by the WARN Act.

14   Q     Thank you.  Would you agree that what you just read

15   correctly lists all the claims that you've made against

16   Heritage and Ms. Franecke in this case?

17   A     Yes.

18   Q     During what time periods of your employment with

19   Heritage do you believe you would have been qualified to

20   receive overtime pay?  Maybe that's a bad question.

21   Were you an hourly employee the entire time you worked

22   for Heritage?

23   A     Yes.  I don't believe -- I think the only salaried

24   employees were the -- like, the high-end managers/the

25   directors, so --

63

1    Q    Gotcha.  We've got another one.  I have what was

2    marked as Exhibit 6, DLF-Heritage 00305 through 00309.

3    Would you please take a look at those.

4                    (WHEREUPON, Exhibit Number 6 was marked for

5            identification and is attached hereto.)

6    A    Jonathan was employed from Heritage Company from

7    October 21, 2014, to December 20, 2022.  While working

8    for the Heritage Company, he was a salesperson and sales

9    manager.  Mr. Yasevich was a salesperson paid weekly

10   from October 21, 2014, through November 21, 2015.  On

11   November 22, 2015, he changed to a sales manager paid

12   biweekly.  Held this position until April 22, 2017.  On

13   April 23, 2017, he changed back to a salesperson and

14   remained this position until the company closed on

15   December 20, 2022 -- or 2020.

16   Q    Thank you.  And I think you had said 2022 at the

17   beginning, but did you mean 2020 -- December 2020?

18   A    Yeah, I meant 2020.  I just read it wrong.

19   Q    And do you agree with this timeline?

20   A    Yes.

21   Q    On 306 through 309 -- do you see those?

22   A    Which one?

23   Q    The next three pages.

24   A    Yes.

25   Q    Take a second and just look at that.  Familiarize

64

1   yourself with that.

2           MR. FORD:  And just for the record, I think

3       December 20th is supposed to be 2019 is when

4       his employment -- we can talk about what that

5       means in here, but I think that's a mistake on

6       her part.  So, I just want to make sure that --

7           MR. DUNN:  Thank you.  And I think you're

8       correct.

9           THE WITNESS:  I didn't even pay attention.

10      Yeah, that's right.

11  Q   (By Mr. Dunn)  So, let's go back to that for a

12  second.  Heritage --

13  A   Closed in --

14  Q   -- closed in December 20, 2019.

15  A   Yes, 2019.

16  Q   So, to the extent that this says 2020, you would

17  disagree with that.

18  A   Yes, on that part.  Yes.  It was 2019.

19  Q   Thank you.

20  A   The month is correct, though.

21  Q   Thank you.  This 306 to 309, does this appear to be

22  a log of the hours you worked each week -- or each day

23  from January of 2017 until Heritage closed?

24  A   Yeah, that seems about right.

25  Q   If you'll look at 306, the first kind of line there

65

1    says Week End January 7, 2017.

2    A    Uh-huh.

3    Q    Do you see that?

4    A    Yeah.

5    Q    Then it looks like you worked eight hours Sunday,

6    seven hours seven minutes Monday, seven hours one minute

7    Tuesday.  Do you see that?

8    A    Uh-huh.

9    Q    And then that sort of pattern continues for every

10   week and every day of that week until Heritage closed,

11   which you could see on Page 309, the last entry being

12   the week end of December 21, 2019.

13   A    Yes.

14   Q    If you'll note, on 306, there is a column -- that

15   would be the fourth column from the right -- that's

16   labeled "OT".

17   A    Uh-huh.

18   Q    Do you see that?

19   A    Yes.

20   Q    And then you can kind of follow down and see each

21   week that it has your overtime for that week, if any.

22   A    Yes.

23   Q    Do you contend that, for any of those times in

24   which overtime is listed, you were not paid that

25   overtime?

66

1    A    Could you rephrase that again?

2    Q    Yes, sir.  So, for example, the third one down says

3    you had an hour and eight minutes of overtime, and that

4    would have been for the week of January 21, 2017.

5    A    Uh-huh.

6    Q    Do you see that?

7    A    Yes.

8    Q    Do you contend you were not paid that overtime?

9    A    I don't know if I was or not, to be honest with

10   you.  You know, honestly, I really couldn't tell you if

11   -- if I did or not.  I, honestly, don't remember working

12   that much overtime at that point, but if it shows it on

13   here in the record, I assume I got paid.  I just can't

14   say for sure if I did or not, because I don't remember

15   the dates.

16   Q    Do you have any reason to believe you were not paid

17   overtime that day -- for that week?

18   A    No.  I don't think so.

19   Q    And not every week does this have you --

20   A    No.

21   Q    -- logged for overtime, right?

22   A    No, not every week.

23   Q    For the ones -- just take a moment and look at the

24   ones that do here, and I guess I would pose the same

25   question.  Is there any time that overtime is accounted

1   for here that you believe -- or have reason to believe

2   you did not get paid that overtime?

3   A     Again, I'm really not for sure on these dates.

4   It's there in black-and-white, but I can't speak on

5   whether I got paid that overtime or not.  One thing I

6   can say is, I don't remember receiving a lot of overtime

7   pay, especially -- when was this?  Was this back in '17?

8   Q     This first page is.

9   A     Yeah, okay.  Because -- I'm looking at '19.  Okay.

10  Yeah, that would have made sense because now, I'm

11  looking at 2019 and there was barely any overtime,

12  because I know at that time -- I'm not sure if we had

13  that much overtime at that point in '19, but '17, that

14  -- around that year I believe there was some times that

15  I did do overtime, so --

16  Q     And, again, just to clarify, the question is, for

17  any of these times in that column that notates you did

18  work overtime --

19  A     Uh-huh.

20  Q     -- is there -- do you have any reason to believe

21  you were not paid for that time?

22  A     For right now, no, I don't.  I don't.

23  Q     Is there something that you can find or somewhere

24  you would look to verify that?

25  A     I can see at home if I have documents but, like I

68

1    said, the pay -- that was years ago and I don't know if

2    I kept -- we moved houses since then, so I don't have

3    those documents.  And I might go out on a limb here and

4    say -- because overtime didn't happen that very often --

5    those -- those might match up to what I was paid.  I'm

6    -- like I said, I'm not for sure.

7    Q    Well, I don't want you to --

8    A    Like, I can't give you a straight --

9    Q    Right.

10   A    -- answer if it matches up or not because, again,

11   that was a while back, and I don't know, and overtime

12   happened rarely.

13   Q    Well, there's not that many entries for overtime on

14   here, is there?

15   A    No.

16   Q    Do you claim you are owed money for any overtime

17   other than what is listed on these pages?

18   A    I believe there is some days but I don't -- like I

19   said, I don't have a document for it, so --

20   Q    Do you have personal knowledge of any of those

21   dates?

22   A    Okay.  So, the only personal knowledge I have is,

23   there is weeks that I've had to get my stuff corrected.

24   And nine times out of ten the times that I was missing

25   was showing under 40 hours.  So, I probably would have

69

1   worked a 40-hour week.  I think the overtime that I did,

2   I don't know if -- I always think the overtime showed up

3   if I'm not -- if I'm not mistaken.  I don't think I was

4   ever under 40 hours with overtime.

5   Q    So, I want to make sure I understand what you're

6   saying.

7   A    Yes.

8   Q    What you're saying is -- correct me if I'm wrong.

9   A    Okay.

10  Q    I don't want to put words in your mouth.  But

11  you're saying your complaint would have been more so of

12  the time between something less than 40 hours and 40

13  hours, not a complaint about overtime; is that fair to

14  say?

15  A    Correct.  Like I said, overtime didn't happen very

16  often.  That's why it's hard to remember some of my

17  checks having overtime, because it didn't happen very

18  often.  I do know there were some times that I did walk

19  away home with a check that I did do overtime that it

20  was there.

21  Q    What would you do in the scenario that you switched

22  to -- let's back up.  Earlier you testified about

23  switching programs --

24  A    Uh-huh.

25  Q    -- and how you would have to log-in and log-out,

70

1    right?

2    A    Uh-huh.  Yes.

3    Q    Yes?

4    A    Yes.

5    Q    Thank you.

6    A    I'm sorry.

7    Q    That's all right.  And that may have happened three

8    or four times a day, right?  Is that what you said?

9    A    Yes.  It was a constant thing.

10   Q    And it may take 30 seconds to switch if you're at a

11   computer.  It may take two minutes if you had to walk

12   across the building.

13   A    Right.

14   Q    And then you described what sounds like what you're

15   saying to be a more prevalent issue, when there was a

16   malfunction in the UniFi system, right?

17   A    Uh-huh.

18   Q    And that may take 10 or 15 minutes to get up and

19   running?

20   A    Yes.

21   Q    What would you do while you're waiting for them to

22   fix that problem and log you back in?

23   A    Sometimes we would just be sitting there talking.

24   Q    Talking to who?

25   A    Just other TSRs.  Like -- so, for example, say they

1    had the group move over to UniFi at that time, whatever

2    it was, and we go in there and sometimes we'd go over

3    there and we wouldn't -- couldn't even log in because

4    they weren't ready.  There was times that we would go

5    over there, we would log in, be there for five/ten

6    minutes, and scripts are wrong.  Sales weren't getting

7    sent through that were already sent through.  Then we'd

8    have -- they'd have to manually log us out and then we

9    would just sit there.  Sometimes we would just sit

10   there.  If it became too long of an issue -- say, after

11   20 minutes or whatever nothing was happening, they'd be

12   down for the day -- we would go back to the other side

13   and clock-in to whatever they had up for there.  But

14   sometimes we would just sit there.

15   Q    So you wouldn't be able to make any phone calls?

16   A    No.  No.  We would -- and, really, people enjoyed

17   it, because we got to sit there and talk and not do

18   anything, so --

19   Q    I think I got another one here.  I'm going to mark

20   this one as Exhibit 7, and it, for the record, would be

21   DLF-Heritage 00321 through 323.  There you go, Mr.

22   Yasevich.  What -- well, take a second and look at that,

23   if you don't mind.  You probably have never seen that

24   before.

25              (WHEREUPON, Exhibit Number 7 was marked for

72

1                   identification and is attached hereto.)

2    A    Okay.  Yeah, this looks like my pay rate as the

3    years progressed.

4    Q    Thank you.

5    A    Yes.

6    Q    And does that look accurate, as far as you can

7    tell?

8    A    Yes.  I know I was hired above $7.25.  I don't know

9    if that's what this is showing, but the $8.75 looks like

10   where I started, because I argued for a higher wage when

11   I got hired.  But everything else seems to be on par of

12   my hourly pay.

13   Q    So, it looks like it kind of -- it increased --

14   A    Yes.

15   Q    -- over time?

16   A    Uh-huh.

17   Q    And what was the cause of those increases?

18   A    Performance.

19   Q    So, you were performing well?

20   A    Yes.  I was one of the top performers there.

21   Q    Good.  I've got another one here.  This one we've

22   marked as Exhibit 8.  It would be DLF-Heritage 00324

23   through 00330.  Take a look at that and tell me what you

24   believe that to be.

25                   (WHEREUPON, Exhibit Number 8 was marked for

73

```
 1              identification and is attached hereto.)
 2   A    Actually, I'm not sure what these -- what the
 3   minutes taken or the hours taken, what that would be.
 4   Q    If I represented to you that this was a log of FMLA
 5   time and dates, does this appear -- do these dates
 6   appear to be the dates that you had taken some FMLA?
 7   A    Let's see.  23rd.  Possibly.  Could I check these
 8   dates on a calendar to see what day they fell on?
 9   Q    If you -- do you have a calendar on your phone?
10   A    Yes.
11   Q    Yeah, that's fine.
12   A    Okay.  Because I know when my doctor's appointments
13   were typically.  I want to make sure those were Fridays
14   and Thursdays that I had.
15        Yes, those seem accurate.  I checked the date.
16   Typically, my doctor's appointment, because I saw a
17   transplant specialist, those would be on Thursdays and
18   Fridays, because those -- I'd have to get, like, an EGD.
19   So, yeah, those -- those dates seem accurate.  I checked
20   one and it seemed like it would be accurate from when I
21   used my FMLA.  Yes.
22   Q    Thank you.  I think that's all we're going to do
23   with that one.  I just wanted to --
24   A    Okay.
25   Q    -- verify that.  You have a claim under the
```

74

1    Arkansas Minimum Wage Act and the FLSA.  Is it your

2    understanding that the factual reasons for those claims

3    are sort of one in the same?

4    A    Yes.

5                   MR. FORD:  Object to form.  you can answer.

6                   THE WITNESS:  Okay.

7    Q    (By Mr. Dunn)  And the WARN Act claim, you had

8    mentioned that earlier.

9    A    Uh-huh.

10   Q    Are you still making that claim?

11   A    Yes.

12   Q    Why are you making a claim under the WARN Act?

13   A    Well, I have multiple reasons for that.  I checked

14   on the WARN Act, and correct me if I'm -- if I'm wrong,

15   from what I read, I believe if it was companies that had

16   over 100 employees or more, or if a company is shutting

17   down, they are supposed to give 30 days' notice prior to

18   it shutting down.  That way people can, in a nutshell,

19   find other employment and stuff like that.  So, that --

20   for that particular reason I filed that.

21        Because, for one, earlier that year -- I'm sure

22   you've heard this story, but we were told -- it was back

23   in August, and it was actually during the UniFy system

24   that we had this meeting and (INAUDIBLE) spoke to us,

25   because information traveled in the building before it

75

1    ever went out.  There was always rumors.  There's always

2    somebody saying something, so we started hearing about

3    some hack; somebody had some hack.  And we were informed

4    that -- and they played it off that it was just some

5    hack.  That everything was taken care of.

6    Q    What was hacked?

7    A    Our system.  So, for the clients that we call,

8    those programs.  Basically, they took -- I don't know

9    what that means.  They took a key -- some kind of coded

10   key that we needed to be able to do our files and to do

11   our calling.  And that right there, they held a ransom

12   to us.  So they -- everything was fine.  They said, you

13   know, even from the very top, Sandra's level and people

14   who worked around her, the message was passed down to

15   our directors that everything was fine.

16        They were talking about new clients that were

17   opening up, one of them being our St. Labre, which was a

18   big client that we had, and that we were actually going

19   to expand our calling, not only from getting pledges, by

20   doing thank you calls and doing other stuff, sending out

21   blankets, things like that.  We were going to expand

22   what we were doing for that.  So, they were pitching

23   that to us, and the reason that we were going to the

24   UniFy system so much at that time.

25        Then that following -- it was during the fall.  I

76

1  want to say it's between September or October we had
2  some type of celebration where they wre giving awards
3  for performances.  Sandra was there.  She had came,
4  along with some other people.  I didn't really pay
5  attention who they were.  But she was speaking on how
6  good the company was doing.  That there was nothing to
7  worry about the hack.  We got past that slump, and
8  everything, and that we were looking excited for the
9  next fiscal year and what was to come, so everybody was
10  on high horses, you know.  They were -- as far as I
11  know, they were still hiring people.
12      Then it comes to the week before the -- they shut
13  down, Christmas.  So, that week they were handing out
14  cruises.  They were handing out cruises to our facility,
15  to the other facilities, and giving away prize money for
16  a little Christmas celebration.  We had district money
17  given to us.  Because that's how parties were given.
18  They would have money that was given to particular
19  facilities and then, from there, the directors would use
20  those facilities how they see fit for celebrations:  if
21  they wanted to give out cash prizes, if they wanted to
22  have, you know, a potluck, whatever that may be.  So, we
23  had a Christmas party.  And nothing was said.  Nothing
24  was said about the company going down.  The hack wasn't
25  addressed.

77

1          Lo and behold, that Friday before Christmas, which
2     is when it got shut down, I go home from work.  I get a
3     message from my coworker, Katie, that Heritage was shut
4     down, but she couldn't explain why.  She said, all I
5     know is Corey came in -- which was the night shift
6     leader -- and said we're shut down.  Don't -- and he
7     didn't know what was going on.
8          We didn't get none of any -- as far as from our
9     facility.  I can't speak for others, but our facility
10    there was no management as far as the directors telling
11    us what had happened, nothing.  There were still people
12    following -- after Christmas that were just finding out.
13    It wasn't -- there wasn't an official announcement until
14    Sandra made that post, and then if you called the
15    weather line at our work, there was an automated message
16    from Derek Tutolo that stated that we're temporarily
17    closed.  We're trying to get back open for January.  We
18    wish you guys the best.  Stuff like that.  That was
19    that.
20         And then following that, which I believe I put into
21    evidence, her Facebook post that she had made.  She had
22    stated what had happened; that there -- our system was
23    hacked, that she paid the ransom, and that -- that she
24    was paying out-of-pocket for our prizes that we got for
25    Christmas, our cruise ships, and --

78

1    Q    Were you aware that she was paying all of

2    Heritage's expenses --

3    A    No, we weren't aware, and she didn't address that

4    in the post.  All she addressed is, she was paying for

5    the vacations.  And my issue, and the reason I filed --

6    and a lot of our issues, if she was paying our wages

7    out-of-pocket and the company was going down, why

8    weren't we notified?  Why were we told two -- three

9    months prior that everything was fine, you know.

10   Q    Do you know what specifically was going on with the

11   negotiations with the cyberterrorists?

12   A    I don't know.  From what we were told is that they

13   paid the ransom.  And that's out of Sandra's mouth from

14   the Facebook post.  That's from out of our directors

15   telling us that the ransom was paid so we could get our

16   key back and we could keep operations.

17   Q    And do you know if the key was actually obtained?

18   A    I can't vouch if any of that stuff is true.  It's

19   just word of mouth.

20   Q    Right.  So, you have no firsthand knowledge as to,

21   really, what happened as far as the negotiations and

22   trying to get the business' programs back up and

23   running.

24   A    No.

25   Q    So, do you know if when Sandra told everyone that

1    it was okay, that she didn't actually believe that?

2    A    I don't know.

3    Q    If Heritage was planning on staying in business up

4    until the week after Christmas, why would they have

5    given you notice that they were shutting down?

6    A    Well, if -- from what I'm understanding from her

7    post, that Heritage shutting down was due to that whole

8    ransom issue.  That the ransom issue had happened prior

9    to that.  I'm just -- I'm -- can I say what I think is

10   my personal opinion or -- okay.  So, just me looking at

11   it, it is a possibility that up until the week of

12   Christmas -- just that week of Christmas it miraculously

13   went under and all the finances were just, poof, gone

14   and they couldn't pay anybody; I don't believe that for

15   a second.

16        And, also, as stated, she was paying us

17   out-of-pocket, so there was an issue at hand if she --

18   for this time that she was paying us out-of-pocket,

19   there was an issue known.  And if that's the case, why

20   weren't we notified prior?  It could have been two weeks

21   prior.  They didn't notify.  They didn't even call us

22   when the company shut down.  They didn't reach out to

23   us.  It wasn't until after everything was shut down and

24   employees had to tell each other to get the

25   notification.  As a company, that should have been a

1   manager's position, and it should have been the

2   higher-ups, and they should have made a statement

3   immediately.

4       And if you knew the -- if you're paying people

5   out-of-pocket -- I mean, if I ran a business, I would

6   assume that if I'm paying people out-of-pocket and I'm

7   making profit, somebody had hacked our system and we

8   went and paid the ransom, there might be some financial

9   issues.  And if it's going -- I don't know.  I just -- I

10   don't -- I find issue with months prior telling us

11   everything is okay and you're dealing with the ransom

12   issue, and then all of a sudden everything is okay up

13   until the week before Christmas.

14   Q   What is the significance of the fact that it was

15   around Christmas?  Is there any other than that's just

16   you remember it being that time frame?

17   A   It was just that -- it was just that time frame.  I

18   mean, it could have been any random old week.  Christmas

19   has no bearing to the situation.

20   Q   Have you performed an analysis or any kind of

21   calculation of any kind to determine the damages you are

22   claiming are owed to you in this case?

23   A   Like -- no calculation.  The only calculation I've

24   done is with, maybe, on trying to give an average number

25   of the times that I was paid, what that would look like

81

1    at the end of the week.  So, that's how I'd determine,

2    you know, based upon the UniFi system and the times we

3    were down for those weeks that I may have been short the

4    check because of those Unify times down.  I would say,

5    an average of one or two.  Anything else pertaining, you

6    know, the WARN Act or anything, I don't -- I don't have

7    any calculations.  No.

8    Q    So, you would agree with me from 2017 to 2019 every

9    week -- you weren't owed money for three or four hours a

10   week, were you?

11   A    No, it wasn't an every weekly thing.  No.

12   Q    So, it was sporadically and then, maybe, one or two

13   hours a week throughout your time period with Heritage,

14   specifically starting in 2017.

15   A    Yes.

16   Q    Is there any documents you have that show your

17   calculations for any of this stuff?

18   A    No, I don't have any documentation.

19   Q    There was a -- I guess I'll just show this to you.

20   There's one more thing I want to point to.  This is

21   Exhibit 9.  This is not Bates stamped.  This is titled

22   Plaintiff Johnathan Yasevich's Supplemental Answers and

23   Responses to Defendants' First Set of Interrogatories

24   and Requests for Production of Documents.  Have you seen

25   that before?  Is your signature on the back?

82

1          (WHEREUPON, Exhibit Number 9 was marked for

2              identification and is attached hereto.)

3   A    Yeah, that is my signature.  That might have been

4   -- let's see.  Yes, I did sign this.  I do remember.  I

5   think this is from someone.

6   Q    So, would you have, along with your counsel,

7   prepared --

8   A    Yes.

9   Q    -- these responses?

10  A    Yes.

11  Q    And did you have -- what did you -- excuse me.  How

12  did you search for documents responsive to these

13  requests?

14  A    I went through -- the only thing that I -- the

15  records that I know I could have obtained was through

16  Facebook.  I attempted to try to look at the

17  conversation that I had with Katie Hensley on -- when

18  she told me, just to kind of give clarification how

19  everybody found out the company closed, but I wasn't

20  able to find that.  It wasn't archived and, of course,

21  it was years ago.

22  Q    Yeah.

23  A    But I was able to find posts that Sandra had made

24  in response to us closing down, and explaining what had

25  happened after it happened.  So, mine was mostly social

1   media, which is not -- really the only documents at this

2   point I could probably obtain.

3   Q   And there's a question in there about Sandra

4   Franecke.  Have you ever personally spoken to her?

5   A   Personally spoke to her, no, but I have been in the

6   same room as she was speaking to us.

7   Q   And these were the events you described previously,

8   celebrations.

9   A   Uh-huh.

10  Q   These kinds of -- kind of general, morale-

11  boosting --

12  A   Yeah.

13  Q   -- speeches --

14  A   Uh-huh.

15  Q   -- right?  Has she ever specifically instructed you

16  to perform any work tasks?

17  A   No.

18  Q   And she didn't -- I mean, what is your

19  understanding of her role with the company?

20  A   That she owned it.  She got it.  It was passed down

21  from her mother -- or she took up over operations.  From

22  what I know and what she explained in the meeting, that

23  she had worked within the company since her mom owned

24  it, and then worked her way up, and then when her mom

25  passed, she got it.

84

1   Q    Was she -- she wasn't operating in any supervisory

2   role.

3   A    At that time, no, not that I know of.

4   Q    Who was in charge of deciding your pay rate?

5   A    That would be the Followells that --

6   Q    Excuse me.  I'm sorry.  How did they -- how did

7   that process work?

8   A    Basically, when they see us all fit, or if I would

9   go up there and, you know, after a certain amount of

10  time -- I know when I was coaching, evaluations didn't

11  come often like it did when you're on the phone, so that

12  was a personal -- based on my performance, I would go up

13  to them and present my case for a pay raise, and then,

14  depending on that, they would yay or nay.  Then when I

15  got back on the phones, it was, you know, evaluation

16  time that they would do the pay raise.  So, there was

17  many different ways that I went about getting a pay

18  raise.

19  Q    Did you ever have that conversation with Ms.

20  Franecke?

21  A    No.

22  Q    Did you ever have any conversation with her?

23  A    No.

24  Q    Did you ever see her have any of these type of

25  conversations with any other employees?

1   A     No.  Like I said, the only time I've seen her was

2   when she came in for celebration-type deals and speaking

3   to the facility.

4   Q     Would you have reported to her if you had an issue

5   with your time or your schedule?

6   A     No.  No.  She was never there, so it wouldn't -- I

7   don't even know how I would have got a hold of her if I

8   wanted to.

9                    MR. DUNN:  I think that's all I have.

10                   MR. FORD:  Just a couple of questions that

11          I hope won't take too much time.

12                          EXAMINATION

13  BY MR. FORD:

14  Q     You've talked a little bit about -- and you guys

15  looked at a couple of exhibits that -- the policies

16  surrounding the way that you had your time tracked.  Did

17  you keep a timesheet of any kind yourself while you

18  worked for Heritage?

19  A     No.  I -- you know, that's -- I never kept up with

20  my time.  It's just not something I ever did.

21  Q     Was it your understanding that your time was kept

22  for you through the software programs --

23  A     Yes.

24  Q     -- that you were using?  Yes?

25  A     Yes.

86

1    Q    Did anyone ever instruct you to record time when

2    the software program was not recording your time?

3    A    No, we were never instructed.  Some people may have

4    done it just because that's how they operated but, no,

5    we were never instructed about it.

6    Q    Do you know if any of your managers were tracking

7    your time when the software programs were not tracking

8    your time?

9    A    As far as I know, no, none of the coaches.  I think

10   it was only the Dereks and the -- we would go up to the

11   person up front to make time corrections.  But as far as

12   the coaches at that time, no.

13   Q    When the issues with the new software program -- I

14   think it's UniFi; is that correct?

15   A    Uh-huh.

16   Q    When those became prevalent, as you've described,

17   did any of your managers ever tell you to track the time

18   that you were spending waiting for those problems to be

19   resolved?

20   A    No.  They would always say they had it or, "We're

21   going to take care of that," and we would just go on

22   about our way.

23   Q    Did they take care of it themselves?

24   A    As far as I -- as far as I know.  Whoever was

25   entering the time at that time.  Like I said, the

1    secretary, when people would go to try to make their

2    time corrections, would record those.  Now, if she

3    personally put them in or if it was the Followells or

4    somebody else, I don't know.  I didn't mess with

5    payroll, so I couldn't tell you.

6    Q    Did you ever see anyone tracking that time while

7    you were experiencing those delays?

8    A    No.  I was never -- I wouldn't know how they did it

9    or what they did it on, so --

10   Q    You also talked about a non-UniFi login and logout

11   time where you said it could take, I think, 30 seconds

12   to two minutes --

13   A    Right.

14   Q    -- was what you testified to.  How many times would

15   that happen each day?

16   A    Logging-in and logging-out?

17   Q    Yes.

18   A    Multiple.  Like I said, we could -- you know, even

19   starting out when I first started there, we would call,

20   maybe, four or five programs within a day, so within

21   that, you know, we may call for an hour, maybe call for

22   two hours.  It was always constant logging-in.  You have

23   to -- if we were going from St. Labre to Special

24   Olympics to Mothers Against Drunk Driving, in between

25   those times you have to log out of one/log into another.

88

1   Q     And this happened, you're estimating, four or five

2   times every day at a minimum?

3   A     Yeah.  It may even be more than that.  I say, you

4   know, this two hours you're calling this program and

5   you're not meeting the requirements, so you get knocked

6   down to another program, so then you have to clock-in

7   and clock-out.  And then the next hour they're doing a

8   different program and now you can go into that one.  It

9   was -- it was just any -- any different program that you

10  had, you had to clock-in and clock-out, and it was at

11  least four or five times a day.

12  Q     Did you ever seek to be paid for that time?

13  A     I had always assumed that it was covered.

14  Q     Why did you assume that?

15  A     Because it was -- I assumed that when they would

16  look at as a whole, they would calculate in those little

17  discrepancies.  That was me making an assumption, so --

18  Q     Did you --

19  A     I mean, I never bothered to check back on it, so --

20  Q     Sure.  So, I guess that was my next question.  Did

21  you ever confirm that that time had been included in

22  your pay for a given week?

23  A     No.  I never asked, so -- and it was never

24  specifically told.  So, again, that was just an

25  assumption.

89

1   Q    You talked there a little bit at the end about who

2   would make certain decisions around time and pay rates

3   and things like that.  Do you know what level of

4   authority the Dereks, as you've called them, had over

5   the operations there?  Do you know what their Chain of

6   Command was?

7   A    As far -- well, as far as I know, the Dereks were

8   in charge of everything, so, like I said, the buck

9   stopped with them.  Towards the last year that we were

10  there, Derrick Followell actually quit working there.

11  He went to work on his church that he had.  Derek Tutolo

12  became the official director, where he was the

13  assistant.  But Derek also got another position within

14  the company to where he was going to all facilities

15  within the company to do training to -- he basically got

16  a position up and was managing all of them.  So, there

17  would be days that -- during that last year where he was

18  gone all week.

19  Q    If Derek had to seek approval from someone above

20  him, whether that be the CEO and Owner or some other

21  position above him, would you have known about that?

22  A    No, I wouldn't have.  And, honestly, that last year

23  being at the position that he was at, I think he had

24  free range to make a lot of decisions.  Like I said, he

25  was traveling from facility-to-facility training

90

1    managers there and helping directors there, so he gained

2    a position.  I would honestly say that he had a lot of

3    say-so that last year of what was going on in the

4    company, but I can't for sure say.  I just know that he

5    moved up in his position.

6                    MR. FORD:  I believe that's all the

7            questions that I have.

8                    MR. DUNN:  Are you going to want him to

9            sign?

10                   MR. FORD:  Yeah, we'll do a read and sign.

11                   (WHEREUPON, the deposition was adjourned at

12           12:15 p.m.)

13                        (WITNESS EXCUSED)

14                   * * * * * * * * *

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

I, Faith Grigsby, Certified Court Reporter in and for the State of Arkansas, do hereby certify as follows:

(1) that on May 10, 2023, Johnathan Yasevich was duly sworn by me prior to the taking of testimony as to the truth of the matters attested to and contained therein;

(2) that the foregoing pages contain and are a true and correct transcript of the proceedings as reported verbatim by me via the voice-writing method to the best of my ability and transcribed and reduced to typewritten form by myself or under my direction and supervision, and subject to appropriate changes submitted by witness, if any, during their requested reading and signing of this deposition according to the Arkansas Rules of Civil Procedure;

(3) that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and that I am not a relative or employee of any attorney employed by the parties hereto;

(4) that I am not financially or otherwise interested in the outcome of this action that affects or has a substantial tendency to affect impartiality or requires me to relinquish control of an original or copies of a deposition transcript before it is certified, or that requires me to provide any service not made available to all parties to the action; and

(5) that I have no contract with the parties, attorneys, or persons with an interest in the action; and that I am not knowingly identified on a preferred provider list, whether written or oral, for any litigant, insurance company, or third-party administrator involved in this matter.

This transcript is prepared at the request of Defendants' counsel and all fees are billed directly to the Davidson Law Firm in compliance with the Arkansas Board of Court Reporter Examiners Regulations Section 19.

WITNESS MY HAND AND SEAL this 29th day of May, 2023.

_____
FAITH GRIGSBY, CCR 664

**$**

**$16 (1)**
59:24
**$2 (1)**
60:1
**$40 (1)**
30:18
**$7.25 (1)**
72:8
**$8.50 (1)**
22:7
**$8.75 (1)**
72:9

**A**

**ability (2)**
6:17,21
**able (5)**
36:24;71:15;75:10;
82:20,23
**above (5)**
39:13,14;72:8;
89:19,21
**according (1)**
48:14
**accounted (2)**
44:24;66:25
**accurate (6)**
57:23;58:6;72:6;
73:15,19,20
**acknowledgment (1)**
45:22
**across (1)**
70:12
**Act (9)**
16:1;62:5,6,13;
74:1,7,12,14;81:6
**action (3)**
61:17,20;62:3
**Acts (1)**
62:4
**actual (2)**
9:17;34:1
**actually (16)**
9:12;13:15;15:4;
22:5;25:4;33:23;
35:21;40:19;52:24;
58:16;73:2;74:23;
75:18;78:17;79:1;
89:10
**add (2)**
54:6,8
**added (1)**
59:15
**address (2)**
5:3;78:3
**addressed (4)**
52:13;57:9;76:25;
78:4
**adjourned (1)**

90:11
**adjustment (2)**
58:2;62:6
**adult (1)**
8:5
**again (13)**
14:4;26:4;35:11;
42:25;49:10;56:22;
57:23;58:5;66:1;67:3,
16;68:10;88:24
**against (2)**
62:15;87:24
**age (2)**
8:18;10:1
**ago (2)**
68:1;82:21
**agree (4)**
51:7;62:14;63:19;
81:8
**Alaska (1)**
24:18
**allow (1)**
27:12
**allowed (1)**
29:1
**almost (2)**
17:21;52:22
**along (4)**
28:4;41:24;76:4;
82:6
**altogether (1)**
5:7
**always (18)**
8:1;23:25;24:20;
26:2;30:25;33:7;
37:18;40:24;42:8;
43:8;54:19;57:23;
69:2;75:1,1;86:20;
87:22;88:13
**Amazon (1)**
15:6
**ambiguous (1)**
51:17
**Amended (1)**
61:19
**American (1)**
35:15
**amount (1)**
84:9
**AMWA (1)**
62:10
**analysis (1)**
80:20
**Anchor (1)**
14:10
**Angelieque (1)**
7:4
**anniversary (1)**
40:7
**announcement (2)**
49:3;77:13
**apologize (2)**
53:15,17

**appear (3)**
64:21;73:5,6
**application (1)**
20:21
**applied (5)**
9:17;20:11,13;21:1;
22:5
**apply (1)**
20:3
**appointment (2)**
44:14;73:16
**appointments (1)**
73:12
**approval (1)**
89:19
**approved (2)**
48:23;49:11
**April (5)**
19:22;41:5,6;63:12,
13
**archived (1)**
82:20
**area (2)**
40:2,9
**argued (1)**
72:10
**Arkansas (10)**
5:4;8:1,5,6,10,18;
13:5;62:4,5;74:1
**around (7)**
7:25;26:6;39:22;
67:14;75:14;80:15;
89:2
**Ashland (1)**
35:14
**assigned (1)**
31:23
**assistant (5)**
37:24;39:2;43:9;
49:6;89:13
**assistants (2)**
39:5;40:17
**assume (4)**
10:16;66:13;80:6;
88:14
**assumed (2)**
88:13,15
**assumption (2)**
88:17,25
**attached (9)**
45:7,24;47:3;59:1;
61:14;63:5;72:1;73:1;
82:2
**attempted (1)**
82:16
**attend (1)**
8:23
**attention (3)**
40:11;64:9;76:5
**attorney's (1)**
62:9
**August (1)**
74:23

**authority (5)**
37:17,18;38:11;
42:10;89:4
**authorized (1)**
48:11
**automated (1)**
77:15
**automatic (1)**
29:23
**automatically (2)**
49:16;59:3
**available (1)**
49:5
**average (3)**
55:13;80:24;81:5
**awards (2)**
39:25;76:2
**aware (3)**
9:3;78:1,3
**away (5)**
24:15;38:12;56:7;
69:19;76:15

**B**

**back (37)**
14:3,3,12;17:3;
19:13,17;20:21,22,23;
24:22;25:9;28:15;
32:18,25;33:22;35:1;
37:13;38:5,9;40:12;
59:9;60:5,19;63:13;
64:11;67:7;68:11;
69:22;70:22;71:12;
74:22;77:17;78:16,
22;81:25;84:15;88:19
**bad (5)**
25:3;37:14;50:17;
58:3;62:20
**ball (1)**
13:21
**barely (1)**
67:11
**based (3)**
30:12;81:2;84:12
**basic (1)**
30:4
**basically (17)**
16:17,25;17:3;
27:19;29:19,22;30:8,
13;36:19,22;37:5;
38:11;39:4;61:21;
75:8;84:8;89:15
**basis (1)**
41:10
**Bates (1)**
81:21
**battled (1)**
28:1
**bearing (1)**
80:19
**became (5)**
53:1;55:25;71:10;

86:16;89:12
**begin (1)**
49:15
**beginning (2)**
24:13;63:17
**behind (1)**
38:9
**behold (1)**
77:1
**benefits (2)**
22:14,16
**besides (1)**
40:6
**best (1)**
77:18
**better (1)**
38:16
**big (8)**
33:10,14;34:13;
47:24;55:25;56:10;
57:13;75:18
**bigger (4)**
11:16;34:17,17;
35:16
**bit (7)**
40:1,12;47:20;
51:17;60:3;85:14;
89:1
**biweekly (2)**
21:21;63:12
**black-and-white (1)**
67:4
**blankets (1)**
75:21
**blast (1)**
55:6
**bold (1)**
47:24
**bonuses (2)**
22:24,25
**boom (1)**
30:2
**boosting (1)**
83:11
**born (1)**
8:4
**both (3)**
21:22,25;46:6
**bother (1)**
60:8
**bothered (1)**
88:19
**bottom (1)**
47:16
**bought (1)**
12:14
**break (19)**
6:6,7,10;14:5,6;
18:5;26:7;28:7,9,12,
17,24,25;41:15;51:23,
24;52:1;59:7,9
**breakroom (1)**
28:16

**breaks (4)**
    28:6,10,18;59:6
**bring (1)**
    62:3
**Broadcast (1)**
    8:17
**buck (2)**
    27:19;89:8
**building (15)**
    27:17,17,20;31:17;
    33:6,8,10,15,21;37:8;
    38:25;39:9,21;70:12;
    74:25
**building-wide (1)**
    44:13
**built (1)**
    26:1
**bullet (1)**
    48:21
**bulleted (2)**
    49:14;60:23
**bump (1)**
    37:3
**business (4)**
    12:8;15:3;79:3;
    80:5
**business' (1)**
    78:22
**busy (1)**
    40:16
**buyer (1)**
    32:14
**buyers (1)**
    32:6

## C

**Cabot (6)**
    7:19,20,22;9:11,13;
    10:7
**calculate (1)**
    88:16
**calculation (3)**
    80:21,23,23
**calculations (5)**
    50:4;51:9;52:4;
    81:7,17
**calendar (2)**
    73:8,9
**California (1)**
    8:4
**call (16)**
    4:25;12:22;13:14;
    14:7;15:1;28:24;30:1,
    3;35:20,23;39:9;75:7;
    79:21;87:19,21,21
**called (11)**
    18:16;24:16;32:4;
    34:10,17;35:18;36:3,
    5;50:15;77:14;89:4
**calling (15)**
    24:17,17;30:1;
    31:14,16,19;32:6;

**34:25;35:13;49:15,**
    17;50:13;75:11,19;
    88:4
**calls (8)**
    28:21;30:9,10,12;
    35:17,18;71:15;75:20
**came (14)**
    14:3;25:22;30:19;
    37:15,19;39:23;50:9;
    51:1,2,4;57:20;76:3;
    77:5;85:2
**can (26)**
    6:6,7;13:2;14:22;
    17:21;19:11;33:13;
    37:3;42:16;45:4;
    47:21;48:21;54:22;
    55:15,16;56:6;64:4;
    65:20;67:6,23,25;
    72:6;74:5,18;79:9;
    88:8
**care (4)**
    44:11;75:5;86:21,
    23
**career (2)**
    9:23;39:20
**Carolina (1)**
    13:5
**case (6)**
    4:16;61:22;62:16;
    79:19;80:22;84:13
**cash (1)**
    76:21
**catch-up (1)**
    54:10
**cause (1)**
    72:17
**cautioned (1)**
    4:5
**celebration (6)**
    22:19,23;39:24;
    40:8;76:2,16
**celebrations (2)**
    76:20;83:8
**celebration-type (1)**
    85:2
**center (2)**
    14:8;47:24
**centers (1)**
    15:1
**CEO (1)**
    89:20
**certain (9)**
    22:24;23:6;30:10,
    12,18;32:14;35:24;
    84:9;89:2
**certifications (2)**
    9:3,4
**Chain (1)**
    89:5
**chair (1)**
    33:1
**change (4)**
    26:18;40:21;46:13,

**19**
**changed (8)**
    11:18;40:25;41:2;
    56:5,13;57:3;63:11,
    13
**changing (1)**
    11:9
**charge (3)**
    36:13;84:4;89:8
**charities (4)**
    12:23;18:11;35:18,
    25
**check (20)**
    8:21;49:25;54:4,5,
    7,7,9,13;55:13;57:22;
    58:15,18;59:12,14,16,
    18;69:19;73:7;81:4;
    88:19
**checked (3)**
    73:15,19;74:13
**checks (1)**
    69:17
**Children's (1)**
    18:12
**Christian (1)**
    35:14
**Christmas (15)**
    18:1,3,5;76:13,16,
    23;77:1,12,25;79:4,
    12,12;80:13,15,18
**church (1)**
    89:11
**cigarettes (1)**
    28:16
**claim (5)**
    68:16;73:25;74:7,
    10,12
**claiming (2)**
    54:12;80:22
**claims (2)**
    62:15;74:2
**clarification (1)**
    82:18
**clarify (1)**
    67:16
**Class (1)**
    61:19
**classroom (1)**
    47:9
**Clayton (1)**
    41:6
**client (1)**
    75:18
**clients (4)**
    24:16;40:4;75:7,16
**clock (1)**
    29:20
**clocked-in (1)**
    49:16
**clocked-out (1)**
    49:18
**clock-in (3)**
    71:13;88:6,10

**clock-out (2)**
    88:7,10
**closed (8)**
    17:17;63:14;64:13,
    14,23;65:10;77:17;
    82:19
**closely (1)**
    52:19
**closest (1)**
    15:23
**closing (3)**
    17:12;57:2;82:24
**closure (1)**
    62:12
**club (2)**
    11:9,18
**clubs (2)**
    10:20;11:11
**coach (15)**
    21:21;29:8,12,13;
    30:25;37:2,11;38:23;
    39:10;41:11;42:12,
    13;50:21,22,25
**Coach/Manager (1)**
    19:15
**coaches (8)**
    36:11;38:18,18;
    39:2,3;41:15;86:9,12
**coaching (11)**
    19:10,21,22;25:10,
    18,19,21;36:12,13;
    37:5;84:10
**coach's (1)**
    29:9
**Code (1)**
    62:5
**coded (1)**
    75:9
**collective (2)**
    61:16,20
**college (7)**
    5:8;7:17;8:7,7,14,
    21,23
**column (1)**
    65:14,15;67:17
**combination (1)**
    38:17
**coming (1)**
    49:4
**Command (1)**
    89:6
**comment (1)**
    16:25
**Committee (2)**
    18:15;35:16
**companies (1)**
    74:15
**company (27)**
    12:21;13:7;16:8;
    18:10;22:17,20;23:8;
    35:10;40:2,9;52:20;
    57:2;63:6,8,14;74:16;
    76:6,24;78:7;79:22,

**25;82:19;83:19,23;**
    89:14,15;90:4
**compensated (1)**
    49:25
**Compensation (1)**
    48:18
**complain (1)**
    56:2
**complained (2)**
    44:3;55:17
**complaint (6)**
    53:19;56:4;61:19,
    20;69:11,13
**complaints (4)**
    43:4,8,12,19
**computer (10)**
    20:21;31:2,7,12;
    32:24;36:4;49:20;
    57:21;58:1;70:11
**computers (5)**
    34:2,7,11,20;47:12
**condition (1)**
    23:14
**confirm (2)**
    52:12;88:21
**congratulating (1)**
    40:3
**connect (1)**
    36:24
**constant (4)**
    32:17;54:10;70:9;
    87:22
**constantly (2)**
    30:1;35:3
**contact (1)**
    41:12
**contacts (3)**
    36:15,16,17
**contend (2)**
    65:23;66:8
**content (1)**
    16:3
**contents (2)**
    16:6,7
**continues (1)**
    65:9
**control (1)**
    38:10
**conversation (5)**
    16:15,17;82:17;
    84:19,22
**conversations (2)**
    16:23;84:25
**Conway (1)**
    18:20
**cook (2)**
    9:20;10:4
**copy (2)**
    45:12,21
**core (4)**
    11:17;36:2;37:4;
    42:9
**Corey (5)**

Case 3:20-cv-00019-KGB   Document 66-2   Filed 06/05/23   Page 95 of 105
Johnathan Yasevich, et al. v.                                    Johnathan Yasevich
The Heritage Company, Inc. and Sandra Franecke                         May 10, 2023

41:5;43:8;49:6;
51:2;77:5
**corrected (7)**
50:24;53:6,20;54:1;
55:18;59:17;68:23
**corrections (3)**
51:4;86:11;87:2
**correctly (1)**
62:15
**costs (1)**
62:8
**counsel (1)**
82:6
**country (3)**
11:12,13,17
**country/pop/hip (1)**
11:12
**couple (6)**
27:8;33:16;44:2;
45:17;85:10,15
**course (7)**
4:14;8:4;12:2;
20:21;21:18;36:15;
82:20
**court (1)**
5:12
**cover (1)**
60:14
**covered (1)**
88:13
**Cowboy (6)**
10:10,25;11:5,10;
12:14;20:5
**coworker (1)**
77:3
**coworkers (1)**
17:10
**created (1)**
34:12
**credit (1)**
60:9
**credited (1)**
56:19
**CRF (1)**
12:21
**crowd (2)**
11:16,17
**cruise (1)**
77:25
**cruises (2)**
76:14,14
**currently (1)**
12:21
**cut (2)**
54:7;59:15
**cutting (1)**
59:12
**cyberterrorists (1)**
78:11

**D**

**daily (2)**

32:22;41:10
**damages (3)**
62:7,8;80:21
**Danielle (1)**
56:7
**date (4)**
18:7;20:24;53:23;
73:15
**dates (13)**
8:21;46:7;55:22;
56:23;57:1;66:15;
67:3;68:21;73:5,5,6,8,
19
**daughter (2)**
7:7,11
**daughter's (1)**
5:7
**day (46)**
17:15,15;21:2;
25:11,17,18;26:2,19;
27:23;28:9;30:10;
31:19,22,23,24;32:1,
2,3,11,21;34:9;39:5;
41:1,16,18;44:14,19,
22,22;47:11;49:8,16,
17;50:16;51:1;56:10;
64:22;65:10;66:17;
70:8;71:12;73:8;
87:15,20;88:2,11
**days (13)**
23:12,12;26:17;
27:1,2,3,5,25;28:4;
56:22;60:11;68:18;
89:17
**days' (1)**
74:17
**daytime (3)**
24:23,24,25
**day-to-day (1)**
41:21
**deal (1)**
57:13
**dealing (2)**
60:4;80:11
**deals (1)**
85:2
**dealt (1)**
54:20
**debate (1)**
19:11
**December (8)**
12:3,19;63:7,15,17;
64:3,14;65:12
**decent (1)**
44:12
**decide (2)**
23:3;37:13
**decided (2)**
24:22;38:16
**deciding (2)**
20:7;84:4
**decision (1)**
13:23

**decisions (2)**
89:2,24
**declaratory (1)**
62:7
**defendants (1)**
4:15
**Defendants' (3)**
62:9,11;81:23
**degree (1)**
8:12
**delays (1)**
87:7
**delivery (1)**
10:4
**demographic (1)**
11:9
**dental (1)**
23:10
**Department (1)**
48:14
**departments (1)**
35:19
**depending (4)**
31:18;49:7;50:13;
84:14
**depends (1)**
33:6
**deposition (4)**
5:10;15:12,17;
90:11
**Derek (6)**
27:18;41:14;77:16;
89:11,13,19
**Dereks (13)**
39:11,12;40:16,25;
41:22;42:3;43:10;
49:2;58:1,3;86:10;
89:4,7
**Derek's (1)**
27:21
**Derrick (2)**
27:18;89:10
**describe (1)**
50:2
**described (3)**
70:14;83:7;86:16
**desk (3)**
44:19;53:25;56:3
**detection (1)**
43:24
**detective (1)**
36:19
**determine (2)**
80:21;81:1
**dialed (1)**
29:24
**dialer (1)**
29:23
**different (17)**
11:14;17:16;31:16;
32:4,19;34:3,6;36:23;
41:2;46:3,10;59:14;
60:18;61:8;84:17;

88:8,9
**diminish (1)**
11:18
**dip (1)**
32:10
**directed (2)**
42:7;49:11
**direction (2)**
33:19;49:7
**directly (2)**
43:10;57:25
**director (1)**
89:12
**directors (16)**
26:14;27:12,14;
37:15,25;39:10;
40:14,24;41:12;
49:11;62:25;75:15;
76:19;77:10;78:14;
90:1
**disagree (2)**
59:19;64:17
**disciplinary (3)**
42:14,16;43:22
**discipline (2)**
37:20;38:8
**disciplining (1)**
38:3
**disclosure (2)**
42:20,21
**disclosures (1)**
30:6
**discrepancies (3)**
53:6,8;88:17
**discussed (1)**
52:7
**disease (2)**
28:1;60:4
**disobeying (1)**
37:21
**display (1)**
58:5
**dispute (1)**
50:3
**distinguish (1)**
5:21
**distribute (1)**
31:14
**distributing (1)**
32:8
**district (1)**
76:16
**DJ (6)**
10:13;11:6,8,20;
12:7;24:5
**DJing (2)**
9:25;14:19
**DLF-Heritage (7)**
45:19,20;46:24;
58:22;63:2;71:21;
72:22
**dock (1)**
43:1

**docked (1)**
42:18;43:2
**doctor's (4)**
44:14;60:13;73:12,
16
**document (6)**
46:21;47:1;48:16;
51:11;61:18;68:19
**documentation (3)**
15:20;22:13;81:18
**documents (8)**
44:25;46:5;67:25;
68:3;81:16,24;82:12;
83:1
**dollars (1)**
30:13
**done (7)**
10:4;14:22;15:16,
18;30:2;80:24;86:4
**door (1)**
30:20
**doors (1)**
10:20
**down (35)**
11:20;12:20;16:8,
11;17:17,22;18:21;
35:10;38:18;47:20;
50:11,16;52:20;60:1;
65:20;66:2;71:12;
74:17,18;75:14;
76:13,24;77:2,4,6;
78:7;79:5,7,22,23;
81:3,4;82:24;83:20;
88:6
**Drive (2)**
5:4;15:7
**driver (1)**
10:4
**Driving (1)**
87:24
**drop (6)**
59:21,21;60:1,4,8,
10
**dropped (2)**
59:23;60:11
**drugs (1)**
6:16
**Drunk (1)**
87:24
**Dude (1)**
17:21
**due (2)**
44:7;79:7
**duly (1)**
4:5
**DUNN (10)**
4:11,15;51:22;52:1;
53:16;64:7,11;74:7;
85:9;90:8
**during (8)**
12:5;21:17;40:22;
53:24;62:18;74:23;
75:25;89:17

**duties (3)**
29:17;36:8,9

**E**

**earlier (5)**
4:14;43:22;69:22;
74:8,21
**early (1)**
56:9
**education/training (1)**
8:25
**EGD (1)**
73:18
**eight (6)**
5:7;7:12;25:6,24;
65:5;66:3
**eight-hour (1)**
28:18
**either (6)**
6:3;33:19;42:3;
43:8;49:4;56:19
**Electric (5)**
10:10,25;11:10;
12:14;20:5
**electronically (1)**
49:19
**else (17)**
12:5,7;15:14,16;
17:18;24:3;38:21;
39:15;42:5,10;56:14;
59:11,19;60:16;
72:11;81:5;87:4
**e-mails (1)**
17:7
**emergency (1)**
29:11
**employed (1)**
63:6
**employee (3)**
43:5;52:3;62:21
**employees (16)**
13:4,9,10;16:9,15;
17:16;46:20,20;50:3;
51:8;52:15,18;62:24;
74:16;79:24;84:25
**employees' (1)**
49:18
**employment (6)**
14:23;18:13;21:18;
62:18;64:4;74:19
**end (7)**
6:11;18:6;49:17;
65:1,12;81:1;89:1
**enjoyed (2)**
37:12;71:16
**enough (2)**
33:20;46:15
**ensure (1)**
49:21
**enter (1)**
29:22
**entering (1)**

**86:25**
**entire (1)**
62:21
**entries (1)**
68:13
**entry (1)**
65:11
**errors (1)**
49:22,23;51:8
**especially (5)**
34:16;41:11;43:15,
22;67:7
**estimating (1)**
88:1
**evaluation (3)**
23:2;30:19;84:15
**evaluations (4)**
23:1;42:17;48:18;
84:10
**even (11)**
19:25;36:6;58:5;
60:11;64:9;71:3;
75:13;79:21;85:7;
87:18;88:3
**evening (1)**
49:23
**events (1)**
83:7
**eventually (1)**
44:15
**Everybody (11)**
16:19;28:23;37:9;
38:21;40:19;45:16;
52:22;56:14;61:16;
76:9;82:19
**everybody's (1)**
36:14
**everyone (1)**
78:25
**evidence (1)**
77:21
**exact (1)**
18:7
**exactly (3)**
23:24;25:1;26:4
**EXAMINATION (2)**
4:10;85:12
**example (3)**
32:6;66:2;70:25
**excited (1)**
76:8
**excuse (3)**
22:3;82:11;84:6
**EXCUSED (1)**
90:13
**executive (1)**
39:16
**Exhibit (21)**
45:3,6,18,20,23;
46:24;47:2;48:16;
58:22,25;60:19;61:9,
13;63:2,4;71:20,25;
72:22,25;81:21;82:1

**exhibits (1)**
85:15
**expand (2)**
75:19,21
**expanded (1)**
57:16
**expenses (1)**
78:2
**experience (1)**
59:20
**experiencing (1)**
87:7
**explain (1)**
77:4
**explained (4)**
41:20;43:21;50:5;
83:22
**explaining (2)**
49:5;82:24
**expressed (1)**
56:18
**expressing (1)**
17:4
**extensive (1)**
9:23
**extent (2)**
16:13;64:16
**extra (2)**
27:11;60:13
**eyelash (1)**
15:4

**F**

**Facebook (8)**
15:22,24,25;17:5,
25;77:21;78:14;82:16
**facilities (4)**
76:15,19,20;89:14
**facility (8)**
18:20;20:18;22:20;
41:13;76:14;77:9,9;
85:3
**facility-to-facility (1)**
89:25
**fact (2)**
60:9;80:14
**factory (2)**
14:9;15:1
**factual (1)**
74:2
**fail (1)**
27:23
**failure (2)**
62:9,11
**Fair (4)**
46:15;49:10;62:3;
69:13
**fall (1)**
75:25
**familiar (4)**
47:4;61:11,15,17
**Familiarize (1)**

**far (19)**
15:19;22:19;37:6;
41:1;42:16;47:8;
52:15;60:17;72:6;
76:10;77:8,10;78:21;
86:9,11,24,24;89:7,7
**February (4)**
12:24;14:4,12,14
**fed (1)**
42:17
**fee (1)**
62:9
**feet (1)**
33:17
**fell (1)**
73:8
**felt (1)**
17:4
**festering (1)**
38:4
**few (8)**
9:15;11:4;15:20;
18:13;43:16,17;
44:11;52:7
**figure (1)**
11:22
**filed (5)**
16:1,22;61:22;
74:20;78:5
**files (1)**
75:10
**filing (1)**
16:14
**fill (2)**
20:21;53:10
**finances (1)**
79:13
**financial (1)**
80:8
**find (9)**
13:23;15:21;54:3,4;
67:23;74:19;80:10;
82:20,23
**finding (1)**
77:12
**fine (4)**
73:11;75:12,15;
78:9
**finish (2)**
32:3;53:14
**Finished (1)**
7:24
**finishing (1)**
59:24
**fired (1)**
11:5
**firefighters (1)**
35:19
**first (12)**
4:5;9:25;21:5;
29:25;41:7;60:20,23;
61:19;64:25;67:8;

**81:23;87:19**
**firsthand (1)**
78:20
**fiscal (1)**
76:9
**fit (3)**
50:14;76:20;84:8
**five (17)**
12:6;25:2,13;27:2,
3,4;32:4,20;54:23;
55:2,11,14;56:18;
60:9;87:20;88:1,11
**five/ten (1)**
71:5
**five-song (1)**
11:13
**fix (1)**
70:22
**floor (4)**
29:2,5;30:16,21
**floors (1)**
9:10
**Florida (1)**
13:6
**FLSA (3)**
62:4,10;74:1
**FMLA (10)**
23:14;27:25;28:5;
59:20;60:2,3,15;73:4,
6,21
**focused (1)**
60:7
**follow (1)**
65:20
**followed (1)**
50:7
**Followell (2)**
27:18;89:10
**Followells (2)**
84:5;87:3
**following (11)**
11:3,4;12:1,24;
18:4,6,6;49:25;75:25;
77:12,20
**follows (2)**
4:9;51:25
**food (3)**
22:17,18,23
**force (1)**
57:15
**FORD (7)**
53:14;64:2;74:5;
85:10,13;90:6,10
**forgot (2)**
46:11,21
**form (1)**
74:5
**formal (1)**
42:14
**format (3)**
5:24;11:11,18
**Forty (1)**
23:20

Johnathan Yasevich, et al. v.
The Heritage Company, Inc. and Sandra Franecke

Johnathan Yasevich
May 10, 2023

**found (3)**
17:11,11;82:19
**four (23)**
11:14;23:1;24:17;
27:11;28:18;31:16;
32:4,20;33:21,22;
34:6;36:18;41:2;
54:23;55:2,11,14;
56:17;70:8;81:9;
87:20;88:1,11
**four-month (1)**
14:16
**Fourteen (1)**
7:14
**fourth (1)**
65:15
**frame (2)**
80:16,17
**frames (1)**
19:19
**franchise (1)**
11:10
**Franecke (4)**
4:16;62:16;83:4;
84:20
**free (2)**
23:5;89:24
**frequently (2)**
56:13;60:15
**Friday (5)**
18:2;26:20;44:20,
23;77:1
**Fridays (2)**
73:13,18
**front (11)**
31:2;33:21;44:19;
50:19,23;51:5;52:25;
53:25;56:3,12;86:11
**full (6)**
16:12;23:17,19,25;
55:6;57:15
**full-time (1)**
10:14
**fully (2)**
6:18;34:15
**functioned (1)**
35:4
**functioning (1)**
34:15

**G**

**gained (1)**
90:1
**game (1)**
54:10
**gather (1)**
15:18
**gave (1)**
49:7
**general (1)**
83:10
**gigs (2)**
12:8;24:5
**girl (1)**
56:7
**given (10)**
5:10;30:5;32:7;
45:12;48:13;76:17,
17,18;79:5;88:22
**giving (3)**
39:25;76:2,15
**goal (1)**
37:8
**goals (2)**
23:6;37:7
**God (3)**
13:24;25:5;33:12
**goes (1)**
20:8
**Good (7)**
4:12,13;13:25;37:1;
40:3;72:21;76:6
**gosh (1)**
5:6
**Gotcha (13)**
5:24;9:14,16,22;
10:8;14:22;26:17;
38:25;40:12,22;
41:24;60:19;63:1
**governed (1)**
29:3
**grace (1)**
13:24
**grade (2)**
7:24,24
**great (3)**
37:19;40:2;41:18
**ground (1)**
5:12
**group (7)**
17:7;39:15,16;
41:17;42:9;50:14;
71:1
**grow (1)**
7:22
**guaranteed (1)**
61:5
**guarantees (1)**
60:24
**guess (11)**
8:18;12:19;13:22;
16:4;17:24;35:22;
40:8;54:3;66:24;
81:19;88:20
**guys (2)**
77:18;85:14

**H**

**hack (5)**
75:3,3,5;76:7,24
**hacked (3)**
75:6;77:23;80:7
**Hampton (1)**
5:4
**hand (3)**
45:3;61:10;79:17
**handbook (8)**
45:8,10,22;46:12,
19;47:5,13;52:24
**handed (3)**
45:20;46:4;47:10
**handing (2)**
76:13,14
**handle (1)**
52:25
**handled (1)**
44:5
**hanging (1)**
6:13
**happen (7)**
11:16;22:21;58:14;
68:4;69:15,17;87:15
**happened (18)**
11:23;16:11;17:2;
42:25;44:23;50:6;
60:2,7,10;68:12;70:7;
77:11,22;78:21;79:8;
82:25,25;88:1
**happening (1)**
71:11
**hard (3)**
5:21;25:12;69:16
**Hawaii (1)**
24:18
**head (1)**
20:17
**health (3)**
23:8,10;60:7
**hear (1)**
17:24
**heard (3)**
17:24;56:1;74:22
**hearing (3)**
35:22;61:7;75:2
**held (3)**
29:14;63:12;75:11
**helping (1)**
90:1
**Hensley (3)**
17:14;52:21;82:17
**HEREINBEFORE (1)**
4:4
**Here's (1)**
20:24
**hereto (9)**
45:7,24;47:3;59:1;
61:14;63:5;72:1;73:1;
82:2
**Heritage (42)**
4:16;11:6,25;12:2,
19,22;13:16,20;
17:22;18:9,10,18;
20:9;22:1,15;24:4,6,
9;26:11;28:3;29:3;
39:1;40:23;45:9,15;
52:2;53:19;55:16;
58:18;62:16,19,22;
63:6,8;64:12,23;
65:10;77:3;79:3,7;
81:13;85:18
**Heritage's (1)**
78:2
**Hey (1)**
34:23
**hierarchy (1)**
38:25
**high (6)**
7:18,23,25;8:19,20;
76:10
**high-end (1)**
62:24
**higher (4)**
8:25;17:18,18;
72:10
**higher-up (1)**
40:9
**higher-ups (1)**
80:2
**hip (1)**
11:15
**hired (7)**
9:9,18;10:10;22:8;
40:20;72:8,11
**hiring (2)**
46:5;76:11
**history (1)**
9:5
**hit (2)**
12:24;29:22
**hits (1)**
29:25
**hold (2)**
10:3;85:7
**home (5)**
13:2,4;67:25;69:19;
77:2
**honest (4)**
26:15;36:7;47:6;
66:9
**honestly (8)**
33:14;40:18;46:4;
58:9;66:10,11;89:22;
90:2
**hop (1)**
11:12
**hop/EDM/things (1)**
11:15
**hope (1)**
85:11
**horses (1)**
76:10
**hour (17)**
6:8;26:7,8;30:14,
14,18;32:5;36:17;
37:1;44:17;51:22;
54:16;57:17;59:24;
66:3;87:21;88:7
**hourly (9)**
21:22,25;22:14;
32:14,15;60:24,24;
62:21;72:12
**hours (45)**
10:16,18;23:20,23;
24:8;25:2,6,8,24;26:8,
9,10,13;27:11,12;
28:17;30:20;43:17,
18;44:3,6,11,23;
55:12,13,20;58:16,17;
59:23,25;60:9;61:5;
64:22;65:5,6,6;68:25;
69:4,12,13;73:3;81:9,
13;87:22;88:4
**houses (1)**
68:2
**HR (4)**
20:17,23;26:14;
57:20
**huh-uh (1)**
5:19
**hundred (1)**
33:16
**Hut (5)**
9:24;10:2,8,9,9

**I**

**IBM (1)**
34:7
**idea (1)**
33:10
**identification (10)**
45:7,18,24;47:3;
59:1;61:14;63:5;72:1;
73:1;82:2
**imagine (1)**
22:12
**immediately (1)**
80:3
**impact (1)**
6:21
**impair (1)**
6:17
**impairment (1)**
6:20
**implement (1)**
44:16
**important (3)**
5:15,16;41:19
**in-and-out (1)**
32:17;38:19,22
**INAUDIBLE (1)**
74:24
**incentive (1)**
23:6
**incidents (1)**
52:7
**included (1)**
88:21
**including (2)**
5:8;61:21
**inconsistent (1)**
33:7;38:14;58:20
**increase (1)**

28:4
**increased (1)**
72:13
**increases (1)**
72:17
**increments (1)**
53:5
**Indian (1)**
35:14
**Indiana (2)**
12:22;13:5
**individual (2)**
51:19;56:18
**influence (2)**
6:16;43:23
**information (1)**
74:25
**informed (1)**
75:3
**in-person (1)**
20:13
**inside (1)**
28:15
**instantly (1)**
20:12
**instruct (1)**
86:1
**instructed (3)**
83:15;86:3,5
**insurance (1)**
23:8
**interaction (1)**
41:9
**interest (1)**
62:8
**Interrogatories (1)**
81:23
**interview (2)**
20:19,23
**interviewed (1)**
21:1
**into (20)**
12:15;15:7;18:14;
19:21;20:23;23:11;
26:1;29:20;31:7,19;
32:16,25;34:3,9,21;
42:17;61:16;77:20;
87:25;88:8
**introduced (4)**
4:14;34:10;53:3;
57:14
**introducing (1)**
35:11
**involved (2)**
41:13,21
**issue (22)**
24:6;34:13;38:8;
44:8,12;52:3,10;
53:19;55:9;56:10;
58:19;60:6;70:15;
71:10;78:5;79:8,8,17,
19;80:10,12;85:4
**issues (11)**

43:14;50:3;52:12,
21,22;53:25;57:3,10;
78:6;80:9;86:13

**J**

**Jackie (3)**
56:11,11,16
**janky (1)**
35:2
**January (4)**
64:23;65:1;66:4;
77:17
**jeopardy (1)**
44:20
**job (18)**
9:5,16,17,25;12:25;
13:25;14:10;17:1;
20:3,8,12;21:2,12;
30:4;36:18;37:1,8,9
**JOHNATHAN (3)**
4:3,18;81:22
**Jonathan (1)**
63:6
**Jonesboro (13)**
5:2,4,5,6;7:15;8:8;
10:6,7,11;14:8;15:9;
18:19;19:3
**Jonesboro> (1)**
18:23
**Journalism (1)**
8:17
**judgment (1)**
62:7
**June (1)**
7:2

**K**

**Kansas (1)**
8:3
**Katie (5)**
17:14,20;52:21;
77:3;82:17
**keep (9)**
4:24;26:10;37:9;
50:25;51:3;55:24,25;
78:16;85:17
**keeping (1)**
36:14
**kept (4)**
26:13;68:2;85:19,
21
**key (4)**
75:9,10;78:16,17
**kind (25)**
4:23;5:13;7:25;9:5,
21;16:12,18;19:11;
22:10;23:6;25:12;
39:4,23;42:15;54:17,
20;64:25;65:20;
72:13;75:9;80:20,21;
82:18;83:10;85:17

**kinds (1)**
83:10
**knew (5)**
16:12;39:8;40:20;
60:6;80:4
**knocked (1)**
88:5
**knowledge (4)**
52:16;68:20,22;
78:20
**known (2)**
79:19;89:21

**L**

**labeled (1)**
65:16
**Labor (2)**
48:14;62:4
**Labre (3)**
35:13;75:17;87:23
**lady (1)**
47:9
**last (16)**
11:22;14:9;18:3,13;
20:16;21:6,9,10;
39:21;56:11,16;
65:11;89:9,17,22;
90:3
**later (1)**
11:20
**lawsuit (3)**
16:14,22;61:17
**lawyer (1)**
15:13
**layoffs (1)**
62:12
**lead (4)**
31:13;36:10;41:24;
42:3
**leader (2)**
10:5;77:6
**leaders (2)**
27:17;40:25
**leading (2)**
32:11;50:20
**leads (4)**
31:17;32:8;36:9;
39:9
**least (2)**
30:18;88:11
**leave (1)**
50:15
**left (2)**
17:15;18:19
**legs (1)**
11:22
**less (3)**
20:1;60:1;69:12
**less/$3 (1)**
60:1
**level (2)**
75:13;89:3

**life (3)**
7:25;8:2,5
**limb (1)**
68:3
**line (5)**
29:25;30:3;36:24;
64:25;77:15
**liquidated (1)**
62:7
**listed (2)**
65:24;68:17
**listen (2)**
36:25;37:2
**lists (1)**
62:15
**Little (12)**
18:20;37:6;40:1,1,
12;47:20;51:17;
58:14;76:16;85:14;
88:16;89:1
**live (3)**
5:1,2;9:13
**lived (4)**
5:5,6;8:1,3
**liver (3)**
28:1,2;60:3
**Lo (1)**
77:1
**loaded (2)**
31:17;34:9
**loading (1)**
34:24
**local (1)**
35:18
**location (3)**
18:22;19:2,5
**locations (3)**
18:17,18;32:19
**log (24)**
26:10;31:7,10,19;
32:18,18,24,25;34:3,
3,20,21,22;35:1;
49:15,17;59:10;
64:22;70:22;71:3,5,8;
73:4;87:25
**logged (2)**
29:21;66:21
**logging (5)**
44:7,7;53:2,2;59:3
**Logging-in (2)**
87:16,22
**logging-out (1)**
87:16
**login (6)**
29:21;31:8,9,19;
34:25;87:10
**log-in (1)**
69:25
**logins (1)**
31:10
**logout (1)**
87:10
**log-out (1)**

**69:25
long (11)**
5:5;7:1;9:14;10:25;
14:5;17:23,23;25:12;
32:23,25;71:10
**longer (2)**
50:20;59:8
**look (15)**
15:21;45:21;46:25;
47:13,15;58:23;
61:11,20;63:3,25;
64:25;66:23;67:24;
71:22;72:6,23;80:25;
82:16;88:16
**looked (2)**
30:13;85:15
**looking (9)**
11:5,8;33:14;48:1;
60:19;67:9,11;76:8;
79:10
**looks (6)**
45:8;47:4;65:5;
72:2,9,13
**lose (1)**
11:19
**losing (1)**
17:1
**lot (10)**
12:9,9;36:12;44:8;
56:5,15;67:6;78:6;
89:24;90:2
**loud (1)**
37:2
**lower-paid (1)**
56:14
**lunch (3)**
26:1,2;28:7

**M**

**machine (2)**
15:3,4
**Maggit (2)**
21:8,11
**mainly (1)**
43:13
**majority (3)**
8:2;34:8;57:12
**making (8)**
5:14;35:20;36:15;
59:24;74:10,12;80:7;
88:17
**malfunction (1)**
70:16
**Mall (1)**
15:5
**managed (1)**
58:20
**management (3)**
37:15;43:4;77:10
**manager (14)**
12:14;19:11;37:23;
38:5;39:2;41:25;

48:11;49:8,23;50:15;
51:12,14;63:9,11
**Manager/Director (2)**
48:23;49:1
**managers (13)**
17:18;27:16;37:25;
38:5,10;39:4;40:13;
50:9,10,11;86:6,17;
90:1
**manager's (1)**
80:1
**managers/the (1)**
62:24
**managing (1)**
89:16
**manner (1)**
49:24
**manually (1)**
71:8
**many (19)**
8:14;27:1;30:9,24;
32:8;33:25;36:14;
40:22;43:17;44:15;
50:22;54:21;55:11;
57:10;58:7,9;68:13;
84:17;87:14
**March (1)**
14:9
**marching (1)**
42:2
**mark (2)**
45:2;71:19
**marked (11)**
45:6,23;47:2;58:25;
61:13;63:2,4;71:25;
72:22,25;82:1
**married (4)**
6:24;7:1,2;11:2
**mass (1)**
62:12
**match (1)**
68:5
**matches (1)**
68:10
**Maumelle (1)**
10:7
**may (23)**
6:17;26:4;32:4,9,9;
33:23;38:19;42:11;
46:10,10;50:12,16;
54:16;57:16;70:7,10,
11,18;76:22;81:3;
86:3;87:21;88:3
**maybe (27)**
12:13,25;18:5;23:1;
24:17;25:7;26:6,14;
30:17;31:16;33:5,16;
39:17;41:2,14;42:12,
19;55:8;57:17,25;
59:5;60:1;62:20;
80:24;81:12;87:20,21
**McCain (1)**
15:5

**McDonald's (1)**
9:18
**meals (2)**
22:17,18
**mean (17)**
13:22;16:10;32:23;
33:10,13,16;36:3;
40:18;43:20;52:21;
53:18;55:11;63:17;
80:5,18;83:18;88:19
**Meaning (1)**
53:10
**means (2)**
64:5;75:9
**meant (1)**
63:18
**measure (1)**
33:11
**mechanic (1)**
9:9
**media (2)**
15:19;83:1
**medical (2)**
23:14,16
**medications (1)**
6:17
**medium (1)**
16:23
**meeting (7)**
23:6;32:15;40:2;
41:16;74:24;83:22;
88:5
**Memphis (2)**
15:6,7
**mental (1)**
37:8
**mentioned (2)**
7:17;74:8
**mess (2)**
57:19;87:4
**message (4)**
17:9;75:14;77:3,15
**messaged (1)**
17:12
**messages (1)**
17:7
**method (3)**
51:7,10;52:2
**might (7)**
21:9;46:19;47:10;
68:3,5;80:8;82:3
**mind (3)**
45:4;61:25;71:23
**mine (1)**
82:25
**minimum (5)**
22:6;23:21;62:5;
74:1;88:2
**minute (3)**
33:5,9;65:6
**minutes (15)**
28:11,14;34:23;
59:4,5,8,10;65:6;

66:3;70:11,18;71:6,
11;73:3;87:12
**minutes/20-minute (1)**
53:5
**miraculously (1)**
79:12
**mismanagement (3)**
43:13,15,20
**miss (3)**
44:22;60:2,12
**missed (3)**
44:8,13;50:1
**missing (13)**
43:17,18;44:6,16,
18;46:21;50:17,19;
53:11;54:19;57:16;
59:12;68:24
**Missouri (1)**
8:3
**mistake (1)**
64:5
**mistaken (2)**
21:9;69:3
**mix (1)**
11:14
**model (1)**
38:14
**modified (2)**
58:7,10
**mom (2)**
83:23,24
**moment (1)**
66:23
**Monday (5)**
18:4;26:20;49:19;
57:20;65:6
**monetary (1)**
62:7
**money (10)**
11:19;12:9;18:11;
22:20;35:21;68:16;
76:15,16,18;81:9
**Montana (1)**
35:14
**month (3)**
30:17;57:7;64:20
**month-and-a-half (1)**
13:1
**months (10)**
9:15,19;11:4,20;
23:2;55:8,23;57:8;
78:9;80:10
**morale (1)**
37:8
**morale- (1)**
83:10
**more (12)**
27:4;31:1;33:2,23;
37:18;45:17;54:22;
69:11;70:15;74:16;
81:20;88:3
**morning (3)**
4:12,13;37:24

most (3)
7:25;25:15;27:9
**mostly (1)**
82:25
**mother (1)**
83:21
**Mothers (1)**
87:24
**mouth (3)**
69:10;78:13,19
**move (2)**
32:19;71:1
**moved (5)**
7:23,25;38:19,21;
68:2;90:5
**moving (2)**
33:3,8
**much (13)**
15:1;22:3;30:14;
39:8;40:20;41:9;53:1;
57:24;59:8;66:12;
67:13;75:24;85:11
**multiple (9)**
11:10;18:17,18;
29:24;31:10;56:2,12;
74:13;87:18
**Muna (6)**
20:17,22;21:4,5,8;
57:25
**must (2)**
48:11,22

**N**

**name (18)**
4:15,17,25;7:3;
17:14;20:16,16;21:5,
5,6,9,10;35:12;36:6;
41:5;56:11,15,16
**NAMED (2)**
4:4;56:7
**names (3)**
40:10;61:15,17
**National (2)**
18:15;35:15
**Native (1)**
35:15
**nay (1)**
84:14
**need (8)**
6:4,6,10;20:7,8;
37:18;44:17,18
**needed (8)**
11:22;14:11;28:24;
35:3;37:9;41:18,19;
75:10
**negotiations (2)**
78:11,21
**new (9)**
12:15;34:10;40:4;
50:13;54:7;57:11,18;
75:16;86:13
**newer (1)**

34:11
**next (13)**
9:16,17;48:7,20;
49:13;54:7,9;56:20;
59:15;63:23;76:9;
88:7,20
**Nick (1)**
4:15
**night (21)**
10:17;11:13;17:14,
16;24:10,10,14;25:2,
15,20;26:5,19,20,23;
37:23,24;39:6;41:1;
43:9;56:9;77:5
**nightclub (2)**
10:11;12:15
**nights (3)**
10:24;12:16;14:21
**nighttime (2)**
25:11;44:20
**nine (4)**
5:8;7:2;22:7;68:24
**ninth (2)**
7:24,24
**nobody (1)**
16:21
**None (3)**
13:21;77:8;86:9
**nonprofit (1)**
12:23
**non-UniFi (1)**
87:10
**noon (2)**
25:11,22
**normal (1)**
36:2
**nos (1)**
30:5
**notates (1)**
67:17
**note (2)**
46:7;65:14
**not-for-profit (1)**
18:11
**notice (4)**
22:2;62:12;74:17;
79:5
**noticed (1)**
46:15
**notification (3)**
48:12;62:6;79:25
**notified (2)**
78:8;79:20
**notify (1)**
79:21
**November (2)**
63:10,11
**number (14)**
30:10,12;45:3,6,23;
47:2,18;58:25;61:13;
63:4;71:25;72:25;
80:24;82:1
**numbers (1)**

29:24
**nutshell (2)**
37:4;74:18

**O**

**oath (1)**
4:8
**Object (1)**
74:5
**obtain (2)**
8:12;83:2
**obtained (2)**
78:17;82:15
**obviously (2)**
5:14,24
**occasion (1)**
53:18
**occasional (2)**
12:8;24:5
**occasionally (1)**
12:12
**occasions (1)**
54:21
**occur (2)**
32:20;54:21
**occurred (2)**
56:22;57:11
**occurring (1)**
16:23
**October (9)**
11:7;12:1;14:10,14;
20:7;39:23;63:7,10;
76:1
**off (13)**
23:12;25:18,19;
27:23,25;28:4,14;
29:7;38:16;58:14,15;
59:24;75:4
**off-and-on (1)**
9:24
**offered (2)**
21:12;22:16
**office (7)**
20:23;38:4;43:16,
25;44:16;50:12;51:5
**official (2)**
77:13;89:12
**often (6)**
14:20;22:22;68:4;
69:16,18;84:11
**Oklahoma (1)**
8:3
**old (6)**
4:19;7:13;34:7,7,
20;80:18
**older (2)**
11:16;36:3
**oldest (1)**
7:11
**Olympics (4)**
18:12;32:6,9;87:24
**Once (6)**

20:22;29:21,24;
30:19;39:17,19
**one (57)**
9:17;13:4,6;15:5;
17:10;18:20,21,23;
21:4,12;25:1;26:24;
28:17;30:1;31:23;
32:5,8,24;34:3,3,7;
35:16;37:17,22;39:5,
5;45:2,2;46:11;47:23;
52:19;56:6,11;58:1,
22;60:17;61:9,24;
63:1,22;65:6;66:2;
67:5;71:19,20;72:20,
21,21;73:20,23;74:3,
21;75:17;81:5,12,20;
88:8
**one/log (1)**
87:25
**ones (6)**
36:1;42:21;46:3;
54:22;66:23,24
**One's (1)**
41:5
**only (19)**
6:11;17:9;22:18;
27:11;32:7;42:16,21;
43:14;46:13;56:5;
60:17;62:23;68:22;
75:19;80:23;82:14;
83:1;85:1;86:10
**on-time (1)**
59:9
**onto (1)**
59:15
**open (3)**
10:20,24;77:17
**opened (1)**
10:21
**opening (1)**
75:17
**operated (1)**
86:4
**operating (2)**
43:15;84:1
**operations (3)**
78:16;83:21;89:5
**opinion (1)**
79:10
**opt (1)**
23:11
**opted (1)**
61:16
**orders (1)**
42:2
**orientation (4)**
47:5,8,9;48:16
**originally (1)**
16:1
**OT (1)**
65:16
**others (1)**
77:9

**otherwise (1)**
6:10
**ourselves (1)**
4:14
**out (56)**
6:13;8:19,20;11:22;
12:22,25;17:11,11;
20:21;22:8,21;24:10;
28:15;30:20;32:2,18,
24;34:3,20;35:1,21;
37:2;39:25;41:14,16,
17,20;44:7;47:10;
49:4,17;53:2;56:13;
58:8;59:2,3,7,10,17,
18;60:18;68:3,24;
71:8;75:1,20;76:13,
14,21;77:12;78:13,
14;79:22;82:19;
87:19,25
**out-loud (1)**
61:25
**out-of-pocket (6)**
77:24;78:7;79:17,
18;80:5,6
**outside (1)**
28:24
**over (15)**
26:16;33:15;34:16,
18,18,21;54:24;57:3;
71:1,2,5;72:15;74:16;
83:21;89:4
**overtime (40)**
27:10;48:8,10,11,
12,13,22;49:3,5,11;
55:2;62:10,20;65:21,
24,25;66:3,8,12,17,
21,25;67:2,5,6,11,13,
15,18;68:4,11,13,16;
69:1,2,4,13,15,17,19
**owed (3)**
68:16;80:22;81:9
**own (1)**
31:8
**owned (2)**
83:20,23
**Owner (1)**
89:20
**owns (1)**
15:3

**P**

**page (10)**
47:21,25;48:7,20;
60:19;61:11,19,24;
65:11;67:8
**pages (3)**
47:15;63:23;68:17
**paid (28)**
21:17,17,20,21;
22:3,3,23:12,13;
48:13;54:13;55:2;
56:19;63:9,11;65:24;

66:8,13,16;67:2,5,21;
68:5;77:23;78:13,15;
80:8,25;88:12
**pandemic (2)**
12:24;13:22
**par (1)**
72:11
**paragraph (8)**
48:21;49:13,14;
50:2;60:20,23;61:24;
62:1
**part (11)**
23:22,23;25:15;
33:3,6,21;50:7;61:6,
7;64:6,18
**partake (1)**
23:9
**parted (1)**
14:1
**particular (7)**
36:21;38:4;50:12,
20,21;74:20;76:18
**parties (3)**
12:11;18:14;76:17
**party (1)**
76:23
**passed (4)**
56:6;75:14;83:20,
25
**past (3)**
32:6,14;76:7
**pattern (1)**
65:9
**pay (28)**
40:10;42:18;43:1,2;
48:1,4,5,8;59:22,23;
60:4,13;61:6;62:9,20;
64:9;67:7;68:1;72:2,
12;76:4;79:14;84:4,
13,16,17;88:22;89:2
**paycheck (1)**
56:20
**paying (8)**
77:24;78:1,4,6;
79:16,18;80:4,6
**payroll (5)**
49:19;58:8;59:17;
60:5;87:5
**paystub (1)**
15:21
**People (31)**
16:19;17:4,17;
24:17;28:15,15,16;
29:9;31:1;32:7;37:5;
38:7;40:9;41:2,7;
44:15;50:22;52:19;
54:18;56:1,12;71:16;
74:18;75:13;76:4,11;
77:11;80:4,6;86:3;
87:1
**per (1)**
30:13
**perform (1)**

83:16
**performance (3)**
39:25;72:18;84:12
**performances (2)**
22:24;76:3
**performed (1)**
80:20
**performers (2)**
34:17;72:20
**performing (2)**
32:13;72:19
**period (4)**
12:6;14:16;30:19;
81:13
**periods (1)**
62:18
**permitted (1)**
28:12
**person (7)**
31:3,9;36:21;38:1;
50:18;56:4;86:11
**personal (5)**
12:7;28:21;52:16;
68:20,22;79:10;84:12
**personally (3)**
83:4,5;87:3
**pertain (1)**
17:10
**pertaining (1)**
81:5
**phone (15)**
28:14,21;29:1,11;
30:4,9,10;36:22,25;
37:2,5;42:19;71:15;
73:9;84:11
**phone-caller (1)**
19:9
**phones (4)**
24:22;29:10;36:24;
84:15
**picks (1)**
29:25
**pitch (4)**
30:4,4,7;36:25
**pitching (1)**
75:22
**Pizza (5)**
9:24;10:2,8,9,9
**place (1)**
12:14
**Plaintiff (1)**
81:22
**plaintiffs (2)**
61:21;62:3
**Plaintiffs' (1)**
62:10
**planning (1)**
79:3
**plant (1)**
62:12
**played (1)**
75:4
**players (1)**

**37:7**
**playing (2)**
29:10;36:19
**please (3)**
4:17;45:3;63:3
**pledges (1)**
75:19
**Plenty (1)**
43:6
**pm (1)**
90:12
**point (6)**
54:15,17;66:12;
67:13;81:20;83:2
**police (1)**
35:19
**policies (1)**
85:15
**political (2)**
18:14;34:11
**poof (1)**
79:13
**pose (1)**
66:24
**position (18)**
10:14;13:12;19:11,
22;23:17;29:14;
38:18;56:13,14;
63:12,14;80:1;89:13,
16,21,23;90:2,5
**positions (6)**
10:3;19:7;21:24,25;
38:20;51:15
**possibility (1)**
79:11
**possible (1)**
48:13
**Possibly (1)**
73:7
**post (15)**
15:22,24,25;16:3,6,
7,25;17:25;18:7;
57:11;77:14,21;78:4,
14;79:7
**posted (3)**
16:3;49:22;57:20
**posts (2)**
17:3;82:23
**potluck (1)**
76:22
**power (1)**
37:22
**predominantly (1)**
11:12
**prejudgment (1)**
62:8
**preparation (1)**
15:11
**prepare (1)**
15:16
**prepared (1)**
82:7
**present (1)**

**84:13**
**pretty (6)**
15:1;20:25;39:8;
40:19;44:12,12
**prevalent (2)**
70:15;86:16
**prevented (1)**
29:4
**previously (1)**
83:7
**primarily (1)**
25:14
**prior (9)**
16:12;20:10;55:7;
74:17;78:9;79:8,20,
21;80:10
**prize (1)**
76:15
**prizes (2)**
76:21;77:24
**probably (17)**
5:8;13:6;15:23;
26:14;32:3,20;33:8,
14;39:14,20;40:17;
46:4;54:22;56:8;
68:25;71:23;83:2
**problem (9)**
34:22;37:15;38:1,4;
50:9;53:1,2;56:1;
70:22
**problems (1)**
86:18
**procedure (1)**
61:3
**procedures (2)**
37:21;47:12
**PROCEEDINGS (2)**
4:1;51:25
**process (9)**
20:20,25;28:3;
30:16;37:3;43:24;
48:10;50:3;84:7
**processes (1)**
41:21
**produce (2)**
12:9;24:18
**producing (1)**
30:20
**Production (1)**
81:24
**profit (3)**
12:23;24:19;80:7
**program (22)**
29:20,21;31:10,14,
20,22,25;32:9,13,16,
24,25;34:24;50:13,
15;57:11;86:2,13;
88:4,6,8,9
**programs (19)**
31:12,16;32:1,4,17;
34:1,8,12,17;35:12,
16,24;53:3;69:23;
75:8;78:22;85:22;

**86:7;87:20**
**progressed (1)**
72:3
**pronunciation (1)**
4:23
**Proper (1)**
48:12
**properly (4)**
35:4;37:21;55:10;
58:21
**provide (3)**
22:2;23:8;62:11
**provided (1)**
23:10
**pull (3)**
20:22,23;58:1
**purpose (1)**
37:22
**purposes (1)**
45:18
**put (10)**
20:22;44:20;50:18,
19;57:4;59:15,18;
69:10;77:20;87:3
**putting (1)**
30:14

**Q**

**qualified (1)**
62:19
**quarter (1)**
23:4
**question-and-answer (1)**
6:12
**quick (1)**
20:9
**quickly (1)**
13:23
**quit (4)**
10:9;11:4;14:10;
89:10
**quite (2)**
15:20;60:3
**quota (1)**
30:9
**quote (1)**
17:21

**R**

**raise (7)**
18:10;23:4;52:3,10;
84:13,16,18
**ran (4)**
35:8;37:25;40:17;
80:5
**random (1)**
80:18
**range (1)**
89:24
**ransom (8)**
75:11;77:23;78:13,

**15;79:8,8;80:8,11**
**ranting (1)**
16:19
**rarely (1)**
68:12
**rate (2)**
72:2;84:4
**rates (2)**
60:24;89:2
**reach (2)**
30:11;79:22
**reaching (1)**
18:14
**read (11)**
42:22;48:7,21;
49:13;59:2;61:2,24;
62:14;63:18;74:15;
90:10
**reading (2)**
5:22;47:7
**readjust (1)**
59:16
**ready (1)**
71:4
**really (19)**
16:2;23:16;26:15;
28:14;40:21;41:8;
46:6,14;47:7,10;
57:16;58:2;60:17;
66:10;67:3;71:16;
76:4;78:21;83:1
**reason (9)**
27:24;58:19;59:25;
66:16;67:1,20;74:20;
75:23;78:5
**reasonable (1)**
62:8
**reasons (2)**
74:2,13
**rebuttal (1)**
42:20
**rebuttals (1)**
30:6
**recall (4)**
19:20;36:5;55:15,
16
**receipt (1)**
45:22
**receive (5)**
22:15,16,17;23:5;
62:20
**received (1)**
21:1
**receiving (1)**
67:6
**recently (1)**
14:2
**recognize (1)**
46:25
**record (9)**
4:17;5:15;55:24,25;
64:2;66:13;71:20;
86:1;87:2

**recording (1)**
86:2
**records (3)**
44:10;46:23;60:5;
82:15
**recount (1)**
54:22
**red (1)**
47:16
**referring (2)**
27:15,16
**refute (1)**
59:4
**Regarding (1)**
16:14
**regardless (1)**
56:17
**regular (2)**
19:9;21:20
**regulations (1)**
48:14
**release (1)**
29:13
**rely (1)**
57:24
**remained (1)**
63:14
**remember (30)**
18:7,22;20:16;21:6;
23:24;24:12;25:1,12;
26:4;40:10;41:3,6,8;
45:11;47:7,8,10,11;
56:6,12,16;57:7;
67:8;61:7;66:11,14;
67:6;69:16;80:16;
82:4
**reopened (1)**
12:15
**rephrase (2)**
6:3;66:1
**replacement (1)**
11:20
**report (3)**
49:22;51:8,11
**reported (2)**
49:24;85:4
**reporter (1)**
5:13
**Reporting (2)**
48:2,5
**represent (2)**
4:15;45:9
**represented (1)**
73:4
**Republican (2)**
18:15;35:15
**Requests (2)**
81:24;82:13
**required (8)**
30:7;31:10;32:18,
19;51:3;54:1;62:10,
13
**requirement (4)**

Case 3:20-cv-00019-KGB  Document 66-2  Filed 06/05/23  Page 102 of 105
Johnathan Yasevich, et al. v.                                                    Johnathan Yasevich
The Heritage Company, Inc. and Sandra Franecke                                        May 10, 2023

30:17;32:14,15;
48:12
**requirements (1)**
88:5
**resolved (1)**
86:19
**response (4)**
16:8,9,10;82:24
**responses (3)**
5:16;81:23;82:9
**responsibility (2)**
29:9;49:21
**responsible (1)**
49:21
**responsive (1)**
82:12
**restate (1)**
6:3
**result (2)**
62:9,11
**resumed (1)**
51:25
**retract (1)**
25:3
**Retraining (1)**
62:6
**review (1)**
45:4
**right (31)**
6:13;11:23;13:17;
15:5;34:12,15,24;
35:1;39:7;42:9;48:5;
52:10;53:16;60:16;
61:8,10;64:10,24;
65:15;66:21;67:22;
68:9;70:1,7,8,13,16;
75:11;78:20;83:15;
87:13
**Rock (1)**
18:20
**role (2)**
83:19;84:2
**room (1)**
83:6
**roughly (2)**
28:19;33:10
**rules (1)**
5:12
**rumors (1)**
75:1
**run (6)**
24:15;32:5;34:2,21;
39:8,9
**running (5)**
32:13;36:17,18;
70:19;78:23

## S

**salaried (1)**
62:23
**sale (2)**
30:2;37:3

**sales (7)**
13:10;19:15;48:23;
49:1;63:8,11;71:6
**salesperson (8)**
19:13,15,17;29:18,
19;63:8,9,13
**same (7)**
21:2;32:23;52:17;
61:6;66:24;74:3;83:6
**Sandra (9)**
16:5;17:25;39:14,
20;76:3;77:14;78:25;
82:23;83:3
**Sandra's (2)**
75:13;78:13
**sat (2)**
28:15,16
**saw (4)**
13:22;39:21;46:15;
73:16
**saying (10)**
16:9;33:16;35:22;
47:7;61:4;69:6,8,11;
70:15;75:2
**say-so (1)**
90:3
**scenario (1)**
69:21
**schedule (5)**
21:14;40:19,20,21;
85:5
**schedules (2)**
40:14,15
**school (8)**
7:15,18,23,25;8:19,
20;35:14,15
**scramble (1)**
11:21
**scripts (2)**
34:25;71:6
**search (1)**
82:12
**seated (1)**
33:24
**seats (1)**
29:7
**second (7)**
48:21;61:11,18;
63:25;64:12;71:22;
79:15
**seconds (6)**
30:3;33:2,4,5;
70:10;87:11
**secretaries (2)**
56:5,6
**secretary (4)**
51:5;52:25;56:3;
87:1
**section (12)**
29:8,8;30:24;31:1,
15,18;34:20;36:23;
37:19;47:21;48:7,18
**sectioned (1)**

29:7
**sections (4)**
30:22;33:21,22,24
**seeing (1)**
45:11
**seek (2)**
88:12;89:19
**seem (3)**
57:13;73:15,19
**seemed (2)**
52:7;73:20
**seems (3)**
61:4;64:24;72:11
**sending (1)**
75:20
**Senior (2)**
48:23;49:1
**sense (1)**
67:10
**sent (2)**
71:7,7
**separate (3)**
59:12,14,18
**September (2)**
39:23;76:1
**sequence (1)**
6:12
**session (2)**
49:15,17
**set (7)**
11:13;26:18;30:21,
25;31:13;40:14;81:23
**setting (1)**
37:7
**seven (3)**
65:6,6,6
**several (2)**
51:14;58:11
**Sherwood (1)**
9:12
**shift (44)**
10:5;17:15,15,15,
16;18:3;24:10,10,14,
20,24;25:2,14,15,17,
18,20;26:3,5,19,19,
20,22,23;27:8,9;
28:18;37:24,24,25;
39:4;40:13,25;41:1,
24,24;42:3;43:9;
44:22;49:8;50:20;
56:9,10;77:5
**shifts (2)**
27:8;40:17
**ships (1)**
77:25
**shop (2)**
9:9,13
**short (2)**
54:2;81:3
**shorter (3)**
27:7,8,9
**show (3)**
27:23;81:16,19

**showed (2)**
40:8;69:2
**showing (2)**
68:25;72:9
**shows (1)**
66:12
**shut (13)**
11:20;12:20;16:8,
11;17:22;18:21;
35:10;76:12;77:2,3,6;
79:22,23
**shutting (5)**
52:20;74:16,18;
79:5,7
**sicker (1)**
28:3
**side (3)**
33:15;34:18;71:12
**sign (5)**
46:14,22;82:4;90:9,
10
**signature (2)**
81:25;82:3
**signed (2)**
46:1,5
**significance (1)**
80:14
**similar (1)**
13:12
**simple (1)**
20:25
**sit (6)**
41:16;53:5;71:9,9,
14,17
**sit-down (2)**
14:11,13
**sitting (4)**
30:1;33:1;34:22;
70:23
**situated (1)**
58:4
**situation (3)**
36:20;44:5;80:19
**six (3)**
25:8,9;33:23
**Sixty (1)**
33:4
**slump (1)**
76:7
**smart (1)**
13:22
**smoke (1)**
28:15
**smooth (1)**
13:19
**social (2)**
15:19;82:25
**software (5)**
34:2;85:22;86:2,7,
13
**Somebody (13)**
16:25;25:4;29:4;
36:16,18;37:20;42:9;

43:23;49:6;75:2,3;
80:7;87:4
**somebody's (2)**
17:1;36:25
**someone (2)**
82:5;89:19
**Something's (1)**
34:24
**sometimes (14)**
5:21;22:21;34:19;
41:13;46:20;50:11,
12;53:10;58:5,17;
70:23;71:2,9,14
**somewhere (1)**
67:23
**son (3)**
7:8,9,13
**songs (1)**
11:14
**soon (1)**
10:9
**sorry (6)**
10:21;26:21;36:11;
53:13;70:6;84:6
**sort (6)**
5:24;6:12;13:19;
47:20;65:9;74:3
**sounds (3)**
51:14;61:2;70:14
**south (2)**
11:11;13:5
**span (2)**
54:24;57:2
**speak (3)**
42:3;67:4;77:9
**speaking (3)**
76:5;83:6;85:2
**Special (4)**
18:12;32:6,9;87:23
**specialist (3)**
31:14;36:10;73:17
**specific (9)**
22:19;31:25;35:24;
36:1;41:16;53:18,23;
57:1;59:23
**specifically (5)**
26:16;78:10;81:14;
83:15;88:24
**speculating (1)**
17:2
**speeches (1)**
83:13
**spending (1)**
86:18
**spent (1)**
20:6
**spoke (2)**
74:24;83:5
**spoken (2)**
15:11;83:4
**sporadically (1)**
81:12
**St (3)**

35:13;75:17;87:23
**stamped (1)**
 81:21
**Standards (1)**
 62:4
**start (11)**
 9:7;12:20;14:3;
 20:24;25:16,16,18;
 29:22;32:3;34:25;
 45:2
**started (34)**
 7:24;9:8,23;10:18,
 22;11:6,18,19,25;
 12:7,25;14:12;16:16;
 18:14,25;19:21;22:4,
 8;25:10,10,20,21;
 31:23;32:2;34:11;
 35:7,11,13;41:8;
 45:13;57:15;72:10;
 75:2;87:19
**starting (4)**
 14:9;24:10;81:14;
 87:19
**state (6)**
 4:16;8:10,18;30:6;
 42:20,21
**stated (3)**
 77:16,22;79:16
**statement (1)**
 80:2
**stats (2)**
 36:14;37:3
**stay (1)**
 36:22
**stayed (4)**
 31:24,25;38:20;
 40:24
**staying (1)**
 79:3
**stepdad (1)**
 9:8
**stepped (1)**
 16:21
**stick (1)**
 60:18
**still (13)**
 12:17;13:25;14:19,
 20;50:23;53:6;54:1;
 59:6,7;61:6;74:10;
 76:11;77:11
**stopped (7)**
 8:21,22;10:2;27:19;
 35:9;55:8;89:9
**stored (1)**
 49:18
**story (1)**
 74:22
**straight (4)**
 8:19,20;43:10;68:8
**Strictly (1)**
 28:11
**studying (1)**
 8:16

**stuff (8)**
 39:25;40:16;68:23;
 74:19;75:20;77:18;
 78:18;81:17
**stuff/to (1)**
 22:21
**subsequent (1)**
 54:13
**Substituted (1)**
 61:19
**sudden (1)**
 80:12
**sue (1)**
 16:20
**suffer (1)**
 6:20
**sufficient (1)**
 62:12
**summer (1)**
 57:8
**Sunday (4)**
 26:21,22,22;65:5
**Sundays (1)**
 10:23
**supervised (1)**
 43:5
**supervisor (1)**
 29:5
**supervisors (2)**
 40:22;41:10
**supervisory (1)**
 84:1
**Supplemental (1)**
 81:22
**suppose (1)**
 31:8
**supposed (4)**
 11:17;30:11;64:3;
 74:17
**sure (23)**
 4:24;20:14;24:3;
 28:23;29:9;33:25;
 40:15;46:9;53:14;
 55:24;60:13,14;64:6;
 66:14;67:3,12;68:6;
 69:5;73:2,13;74:21;
 88:20;90:4
**surrounding (1)**
 85:16
**sweep (1)**
 9:10
**switch (4)**
 32:1,9;52:23;70:10
**switched (3)**
 4:23;32:16;69:21
**switching (1)**
 69:23
**sworn (1)**
 4:6
**system (31)**
 29:22;34:9,10;35:3,
 5,7,13,23;36:1,2,5;
 44:8,14;52:24;53:3,

23;54:25;57:3,11,14,
18;58:4,16;59:3;
70:16;74:23;75:7,24;
77:22;80:7;81:2
**systems (2)**
 34:6;36:4

**T**

**talk (5)**
 9:5;20:15;41:17;
 64:4;71:17
**talked (9)**
 14:24;24:2;28:6;
 36:8;39:18;40:1;
 85:14;87:10;89:1
**talking (14)**
 14:13;28:18;34:1;
 40:2,4,13;52:2;54:25;
 55:12;60:20,23;
 70:23,24;75:16
**taps (1)**
 32:10
**tasks (1)**
 83:16
**team (2)**
 32:11;37:7
**telephone (1)**
 31:5
**telling (4)**
 17:17;77:10;78:15;
 80:10
**temporarily (1)**
 77:16
**ten (4)**
 28:11,14;59:8;
 68:24
**tended (1)**
 11:15
**ten-minute (6)**
 26:7;28:9,12,17,18;
 59:6
**term (1)**
 13:15
**testified (3)**
 4:8;69:22;87:14
**testify (2)**
 4:6;6:18
**that'd (2)**
 25:8;54:18
**THEREUPON (1)**
 4:2
**third (1)**
 66:2
**Thirty-three (1)**
 4:20
**though (1)**
 64:20
**thought (2)**
 42:11;46:16
**three (14)**
 9:18;23:1;30:5;
 34:5;35:8;38:20;55:1,

8,13,20;63:23;70:7;
78:8;81:9
**three-year (1)**
 57:2
**Throgmartin (2)**
 41:5;43:9
**throughout (1)**
 81:13
**Thursdays (3)**
 10:23;73:14,17
**tier (5)**
 59:23;60:4,8,10,11
**tiers (1)**
 59:22
**timeline (1)**
 63:19
**timely (1)**
 49:24
**times (45)**
 21:19;22:22;27:11;
 32:21;33:22;43:14,
 16,17;44:2,11;46:10;
 50:22;52:16;53:4,7,9,
 24;54:14,23;55:2,11,
 14;56:2,10,18;57:15,
 25;58:7,9,15;65:23;
 67:14,17;68:24,24;
 69:18;70:8;71:4;
 80:25;81:2,4;87:14,
 25;88:2,11
**timesheet (3)**
 55:17;58:11;85:17
**timesheets (1)**
 49:20
**tired (1)**
 54:15
**title (4)**
 47:21;48:17;61:10,
 18
**titled (2)**
 48:8;81:21
**today (2)**
 6:17;15:12
**told (11)**
 20:4;21:14;38:11;
 52:20,20;74:22;78:8,
 12,25;82:18;88:24
**took (5)**
 38:12,17;75:8,9;
 83:21
**top (3)**
 32:12;72:20;75:13
**total (2)**
 13:6;33:15
**Towards (1)**
 89:9
**to-wit (1)**
 4:9
**track (1)**
 86:17
**tracked (1)**
 85:16
**tracking (3)**

8,13,20;63:23;70:7;
78:8;81:9
**training (5)**
 30:16;47:5,9;89:15,
 25
**transcript (1)**
 5:22
**transition (1)**
 13:19
**transplant (2)**
 28:2;73:17
**traveled (1)**
 74:25
**traveling (1)**
 89:25
**treated (1)**
 42:23
**tried (4)**
 5:13;15:21;44:16;
 55:7
**trip (1)**
 23:5
**trouble (1)**
 38:3
**true (1)**
 78:18
**truth (3)**
 4:6,7,8
**truthfully (1)**
 6:18
**try (9)**
 4:24;6:3,7;15:18;
 44:10;58:3;60:14;
 82:16;87:1
**trying (11)**
 8:21;11:21;22:6;
 24:12;25:6;34:10;
 35:20;56:10;77:17;
 78:22;80:24
**TSR (12)**
 13:12,14;19:9;
 21:20;25:11;29:17;
 30:10;31:7;36:8;
 37:13;38:16,23
**TSRs (4)**
 30:24;39:1,3;70:25
**Tuesday (4)**
 18:4;26:21;49:23;
 65:7
**turn (1)**
 47:15
**turned (1)**
 28:2
**Tutolo (4)**
 27:19;41:14;77:16;
 89:11
**Twelve (4)**
 13:8,9;33:22,24
**twice (1)**
 39:21
**two (29)**
 8:15;11:20;14:7;
 26:8,9;27:21;28:17;
 30:5,17;33:5,9;34:6;

86:6,7;87:6
**training (5)**
 30:16;47:5,9;89:15,
 25
**transcript (1)**
 5:22
**transition (1)**
 13:19
**transplant (2)**
 28:2;73:17
**traveled (1)**
 74:25
**traveling (1)**
 89:25
**treated (1)**
 42:23
**tried (4)**
 5:13;15:21;44:16;
 55:7
**trip (1)**
 23:5
**trouble (1)**
 38:3
**true (1)**
 78:18
**truth (3)**
 4:6,7,8
**truthfully (1)**
 6:18
**try (9)**
 4:24;6:3,7;15:18;
 44:10;58:3;60:14;
 82:16;87:1
**trying (11)**
 8:21;11:21;22:6;
 24:12;25:6;34:10;
 35:20;56:10;77:17;
 78:22;80:24
**TSR (12)**
 13:12,14;19:9;
 21:20;25:11;29:17;
 30:10;31:7;36:8;
 37:13;38:16,23
**TSRs (4)**
 30:24;39:1,3;70:25
**Tuesday (4)**
 18:4;26:21;49:23;
 65:7
**turn (1)**
 47:15
**turned (1)**
 28:2
**Tutolo (4)**
 27:19;41:14;77:16;
 89:11
**Twelve (4)**
 13:8,9;33:22,24
**twice (1)**
 39:21
**two (29)**
 8:15;11:20;14:7;
 26:8,9;27:21;28:17;
 30:5,17;33:5,9;34:6;

Johnathan Yasevich, et al. v.
The Heritage Company, Inc. and Sandra Franecke

Johnathan Yasevich
May 10, 2023

38:20;40:24;41:7;
42:25;46:3,6;49:4;
55:13,20;70:11;78:8;
79:20;81:5,12;87:12,
22;88:4
**type (3)**
22:2;76:2;84:24
**typical (2)**
25:4;27:13
**typically (10)**
6:7;10:20;11:13;
24:8;26:17;34:18;
36:17;49:3;73:13,16

**U**

**under (11)**
6:16;37:25;43:23;
61:5;62:3,5;68:25;
69:4;73:25;74:12;
79:13
**Understood (4)**
5:18,23;6:5,15
**UniFi (17)**
34:11;35:5,7,13,23,
24;36:1;44:7;53:3,23;
54:25;55:5;57:14;
70:16;71:1;81:2;
86:14
**UniFy (3)**
74:23;75:24;81:4
**unique (2)**
31:8,9
**unless (4)**
27:11;46:12,12;
59:16
**unpaid (2)**
54:12;55:3
**up (62)**
4:24;7:22;9:24;
10:21;14:10,12;
16:21;17:19;20:11,
20;26:13;27:23;
29:12,25;30:14,22,25;
31:13,17;32:1,9;
36:14;37:3;38:5;
39:23;40:8;44:15;
48:22;50:11,18,18,23;
51:3,4;52:25;53:25;
54:9,18;55:7;58:1;
60:6,14;68:5,10;69:2,
22;70:18;71:13;
75:17;78:22;79:3,11;
80:12;83:21,24;84:9,
12;85:19;86:10,11;
89:16;90:5
**update (1)**
49:19
**upon (1)**
81:2
**upper (2)**
38:5,9
**upset (2)**

16:19;17:1
**USC (1)**
62:4
**use (4)**
5:16;13:18;29:1;
76:19
**used (5)**
13:15;50:3;52:2;
61:3;73:21
**using (2)**
55:8;85:24
**Usually (3)**
23:4;43:12;44:6

**V**

**vacation (1)**
23:13
**vacation/sick (1)**
23:12
**vacations (1)**
78:5
**vending (2)**
15:3,4
**verbal (1)**
22:11
**verbalize (1)**
5:15
**verify (2)**
67:24;73:25
**versions (1)**
58:11
**via (1)**
17:5
**viewed (1)**
49:20
**violation (1)**
42:19
**vouch (1)**
78:18

**W**

**wage (5)**
22:6,14;62:5;72:10;
74:1
**wages (2)**
62:10;78:6
**wait (4)**
6:11;34:23;35:2;
49:25
**waiting (2)**
70:21;86:18
**walk (2)**
69:18;70:11
**walking (1)**
29:5
**WARN (6)**
16:1;62:13;74:7,12,
14;81:6
**warning (1)**
42:24
**warnings (1)**

42:25
**way (11)**
6:13;30:21;31:13;
43:21;46:22;47:20;
57:22;74:18;83:24;
85:16;86:22
**ways (2)**
14:1;84:17
**weather (1)**
77:15
**weddings/quinceañeras/birthday (1)**
12:11
**Wednesday (1)**
26:22
**week (38)**
18:3,6,6;20:10;
23:20;27:1,3,4;40:14;
55:20;58:12,13;
59:25;64:22;65:1,10,
10,12,21,21;66:4,17,
19,22;69:1;76:12,13;
79:4,11,12;80:13,18;
81:1,9,10,13;88:22;
89:18
**weekend (1)**
12:13
**weekends (1)**
12:16
**weekly (3)**
21:20;63:9;81:11
**weeks (7)**
27:6;55:22;58:13;
60:12;68:23;79:20;
81:3
**weird (1)**
37:16
**weren't (17)**
14:17;29:1,10;
30:19;32:12;35:20;
44:21,23;57:23;
58:17;59:9;71:4,6;
78:3,8;79:20;81:9
**what's (1)**
36:19
**whenever (1)**
25:17
**whereas (1)**
36:1
**WHEREUPON (11)**
45:6,23;47:2;51:24;
58:25;61:13;63:4;
71:25;72:25;82:1;
90:11
**whole (5)**
4:7;43:24;44:13;
53:13;79:7;88:16
**wife (5)**
11:2,3;15:2,3;20:4
**Wish (2)**
18:12;77:18
**wit (1)**
51:25
**within (22)**

9:23;11:11;12:9;
29:7;30:7;31:16;
35:24;37:9,18;38:25;
39:1,15;41:13;42:9;
43:16;46:5;57:1;
83:23;87:20,20;
89:13,15
**WITNESS (4)**
4:4;64:9;74:6;
90:13
**word (2)**
51:17;78:19
**worded (1)**
59:14
**words (1)**
69:10
**work (34)**
9:14;10:23,25;11:6;
12:21;13:7;14:9,22;
19:2;24:8,20;25:6,11,
14;26:17;27:24;
28:13,22;35:3;38:15;
48:12,13;52:22;
59:22,25;60:12,13;
61:7;67:18;77:2,15;
83:16;84:7;89:11
**Worker (1)**
62:6
**working (17)**
9:7,8;11:2;12:5,13,
25;14:17;15:5;20:6;
24:3;39:15;40:21;
55:9;61:5;63:7;66:11;
89:10
**works (1)**
15:6
**worry (1)**
76:7
**wre (1)**
76:2
**writing (3)**
22:10,12,13
**written (1)**
59:2
**wrong (7)**
4:25;21:10;52:6;
63:18;69:8;71:6;
74:14

**Y**

**y'all (1)**
51:22
**YASEVICH (11)**
4:3,18,19,21,22,22;
5:1;7:5;58:23;63:9;
71:22
**Yasevich's (1)**
81:22
**yay (1)**
84:14
**year (18)**
11:1;12:6,9;14:4,8,
9,16;19:25;20:1;35:9;
56:24;67:14;74:21;
76:9;89:9,17,22;90:3
**year-and-a-half (3)**
14:2;35:10;55:7
**years (18)**
5:8,8;7:2,23;8:14,
15;14:7;15:20;18:13;
25:13;34:5,6;35:8;
55:1,23;68:1;72:3;
82:21
**Yep (1)**
46:2
**younger (2)**
11:16;56:8
**youngest (1)**
7:12

**0**

**00305 (1)**
63:2
**00309 (1)**
63:2
**00321 (1)**
71:21
**00324 (1)**
72:22
**00330 (1)**
72:23
**00341 (1)**
45:21
**00355 (1)**
45:21
**00382 (1)**
45:19
**00440 (1)**
58:22
**00442 (1)**
46:24
**00461 (2)**
45:19;46:25

**1**

**1 (5)**
45:3,6,18;61:24;
62:1
**10 (2)**
33:2;70:18
**10/15 (1)**

34:23
**10:00 (6)**
    10:20,21,22;24:14,
    15,16
**100 (1)**
    74:16
**10-minute/15-minute (1)**
    28:10
**11/01/17 (1)**
    46:11
**11:00 (2)**
    26:3,5
**11:30 (1)**
    26:5
**11-4-201 (1)**
    62:5
**12 (6)**
    13:6;29:7;30:25;
    31:1;36:23,23
**12:00 (2)**
    26:3,5
**12:15 (1)**
    90:12
**15 (7)**
    9:8;33:2;36:17;
    53:5;59:5,10;70:18
**16 (1)**
    9:7
**16/17 (1)**
    10:1
**17 (3)**
    10:1;67:7,13
**18 (1)**
    28:1
**19 (2)**
    67:9,13

---

**2**

**2 (2)**
    45:20,23
**2:00 (1)**
    10:21
**20 (5)**
    23:23;63:7,15;
    64:14;71:11
**2008 (1)**
    8:21
**201 (1)**
    62:4
**2014 (7)**
    11:1,7,23;18:25;
    19:22;63:7,10
**2015 (3)**
    19:23;63:10,11
**2017 (15)**
    24:22;25:17,19;
    46:14;55:5,6;56:25;
    57:5;63:12,13;64:23;
    65:1;66:4;81:8,14
**2018 (1)**
    56:25
**2019 (11)**

12:3,19;55:5;56:25;
    64:3,14,15,18;65:12;
    67:11;81:8
**2020 (5)**
    63:15,17,17,18;
    64:16
**2022 (3)**
    63:7,15,16
**20s (1)**
    56:9
**20th (1)**
    64:3
**21 (8)**
    8:22;10:1;59:4;
    63:7,10,10;65:12;
    66:4
**2103 (1)**
    5:4
**22 (3)**
    9:24;63:11,12
**23 (1)**
    63:13
**23rd (1)**
    73:7
**25 (1)**
    23:23
**29 (1)**
    62:4

---

**3**

**3 (5)**
    46:24;47:2;48:16;
    60:19;61:24
**3:00 (1)**
    25:7
**30 (5)**
    30:2;61:5;70:10;
    74:17;87:11
**306 (4)**
    63:21;64:21,25;
    65:14
**309 (3)**
    63:21;64:21;65:11
**30-minute (2)**
    26:2;28:7
**31 (2)**
    28:1,2
**323 (1)**
    71:21
**35 (1)**
    23:25
**35-plus (1)**
    59:25

---

**4**

**4 (2)**
    58:22,25
**4:00 (4)**
    24:11,13,20;25:2
**40 (7)**
    23:25;24:1;30:20;

68:25;69:4,12,12
**401k (1)**
    23:11
**402 (2)**
    47:18,25
**40-hour (1)**
    69:1
**441 (1)**
    58:23
**444 (1)**
    48:17
**445 (3)**
    48:20;60:19,21

---

**5**

**5 (2)**
    61:9,13
**5:00 (3)**
    24:25;25:1;44:22
**50 (1)**
    27:12
**50-year (1)**
    40:7

---

**6**

**6 (2)**
    63:2,4
**6:00 (1)**
    26:6
**60 (1)**
    33:5

---

**7**

**7 (3)**
    65:1;71:20,25
**7:00 (1)**
    24:25
**72401 (1)**
    5:4

---

**8**

**8 (2)**
    72:22,25
**8:00 (1)**
    24:25
**8:00We (1)**
    10:19

---

**9**

**9 (2)**
    81:21;82:1
**9:00 (6)**
    10:22;24:11,13,16,
    20;25:2