IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

**JOHNATHAN YASEVICH, et al.,**                                   **PLAINTIFFS**
Each Individually and on Behalf
of All Others Similarly Situated

vs.                              No. 3:20-cv-19-KGB

**THE HERITAGE COMPANY, INC.,**                                   **DEFENDANTS**
**and SANDRA FRANECKE**

## DECLARATION OF CHANELL WILLIAMS

I, Chanell Williams, do hereby swear, affirm and attest as follows, based upon my personal knowledge of the matters contained herein:

1. My name is Chanell Williams, and I am over the age of eighteen (18) and duly qualified to execute this declaration.

2. I am currently a resident and domiciliary of the State of Arkansas.

3. I was employed by The Heritage Company, Inc., and Sandra Franecke, from about April of 2012 until about December of 2019. I worked as a Telemarketing Sales Representative ("TSR").

4. The Heritage Company, Inc. ("Heritage") is a business that is owned and operated by its CEO, Sandra Franecke ("Ms. Franecke"). Heritage is a telemarketing company that performs services for non-profits throughout Arkansas.

5. Specifically, non-profit organizations contract with Heritage, who then uses TSRs such as myself to make fundraising and thank you calls to donors and potential donors.

6. While operational, Heritage and Ms. Franecke ran several call centers in Arkansas in locations such as Conway, Little Rock, Sherwood, Searcy and Jonesboro. I worked at the Little Rock center.

7. During my employment, I became somewhat familiar with the authority structure and policy-making hierarchy of The Heritage Company.

8. Most of the day-to-day management of employees was performed locally, meaning that there were managers on-site at each call center to handle the day-to-day management and scheduling for employees.

9. These managers even handled the hiring, training, disciplining, and firing of TSRs and other employees.

10. Even though these managers ran the daily operation of the call centers, it was my understanding that their decisions were subject to existing policies and procedures set up by a higher-up executive. Specifically, the decisions were made according to the policies and procedures written by Ms. Franecke in her role as CEO.

11. Ms. Franecke's name was always coming up in association with the executive decisions made in running Heritage. Everyone knew her name and who she was because our managers were always telling us about "how Ms. Franecke wants things" and "what Ms. Franecke said about such-and-such."

12. Ms. Franecke attended monthly meetings with my managers, and the managers would always come back from these meetings with additional tips or policy changes that they said Ms. Franecke wanted.

13. When I was hired, I was under the impression that it was because I met certain pre-set criteria that allowed me to be hired on without executive approval. Had I

not met these criteria, I either would have been denied a job or the HR person who hired me would have been required to get approval.

14. I was given a pre-written employee handbook and was trained through pre-written course materials. It was my understanding that I would have received this same handbook and training regardless of which call center I worked at, even though each call center has different managers.

15. While my managers in Little Rock made decisions about where and when I worked, they did not set my pay nor sign my paychecks. My wages were set by the executive office, who I assumed was Ms. Franecke.

16. I assumed this because my managers were always referencing Ms. Franecke's approval and input in the decisions they made. Also, even though my managers handed me my paychecks, Ms. Franecke signed them.

17. While my managers acted with a lot of autonomy, it was my impression that most of their actions were subject to procedures handed down from higher up.

18. I know that Ms. Franecke was involved in company management because whenever my managers would have meetings with the executives, they always came back and implemented changes that they attributed to Ms. Franecke.

19. Specifically, I remember that if you didn't reach your total hours, your pay was reduced; this was a policy Ms. Franecke implemented. Ms. Franecke also had a policy that if you didn't meet quota, you could be terminated. My managers specifically said was being implemented because Ms. Franecke wanted it done that way.

20. My managers had been working for Heritage for a long time and were familiar enough with the policies and procedures of the company that they didn't have to get approval for everything, but there were still things that required executive approval.

21. Ms. Franecke was hardly ever physically present at the call center, but we all knew who she was and that she owned Heritage because our managers would tell us what she would or would not allow.

22. I did see Ms. Franecke at the Little Rock call center a few times during my employment, probably around 2019.

23. I also met her at the company Christmas party where she personally gave away cruise tickets and other prizes. She would do a lot of incentives, and I was shocked when I heard about the breach because she was continuously giving out cruises.

24. Heritage employees frequently communicated with each other via a private Facebook page. We communicated with each other, but also Heritage passed on important information to us from the executives via the page. Ms. Franecke was the administrator of the page and wrote most of the posts regarding Heritage policies and changes, as well as posting employee shout-outs and accolades.

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on this 9th day of June, 2023.

_____
**CHANELL WILLIAMS**